841 So.2d 455 (2003)
Norman Mearle GRIM, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC01-256.
Supreme Court of Florida.
March 20, 2003.
*456 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
This is an appeal from convictions for first-degree murder and sexual battery upon a person twelve years of age or older with use of a deadly weapon. The appellant was sentenced to death for the first-degree murder conviction and sentenced *457 consecutively to 390.5 months' imprisonment for the sexual battery conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm both convictions and sentences.

FACTS
On July 27, 1998, at approximately 5:08 a.m., Deputy Sheriff Timothy Lynch responded to a call from Cynthia Campbell, who complained of a disturbance behind her house. Upon Lynch's arrival, Campbell was standing on her front porch with her next-door neighbor Norman Grim, Jr., who was wearing a pair of cut-off jean shorts. All three walked around the porch to the back of Campbell's house where Lynch noticed a broken window and a chrome lug nut in the surrounding bushes. Before returning to his house, Grim invited Campbell over for a cup of coffee after Lynch finished his investigation.
Connie Kelley, Campbell's bookkeeper, arrived at Campbell's house at 7:20 a.m., entered the house, called Campbell's name, but did not receive an answer. Kelley became concerned and called the police. Cynthia Magee, Campbell's paralegal, went to Campbell's house later in the morning, saw her car parked in front of the house, and went inside to check. Deputy Sheriffs Calvin Rutherford and Steven McCauley arrived ten to fifteen minutes after Magee.
Rutherford obtained permission from Grim to look inside his home and noted that Grim had no shirt on and that there was a light pink color on one of his shoulders.[1] Neither deputy saw any signs that there had been a struggle in the house.
Corporal Blevin Davis arrived at 11 a.m. and talked briefly with Grim. Davis observed that Grim was wearing a pair of cut-off blue jean shorts with several small reddish brown stains on them; there was another reddish-brown stain on his shoulder. Grim explained that the stains were primer paint from where he had been working on his car. Grim asked for and obtained permission to get his dogs that were now loose in the neighborhood.
Thomas Rodgers, the manager of the north end of the Pensacola Bay fishing bridge, ran a bait and tackle shop and convenience store at the foot of the fishing bridge, and he testified that sometime early in the afternoon of July 27, 1998, Grim came into his store. On the same day, Cynthia Wells, a former coworker of Grim, left work around 1 p.m. and was traveling on the Pensacola Bay bridge where she saw Grim walking beside his parked car with both doors and the trunk open. She testified that he was wearing a light-colored shirt and cut-off blue jean shorts.
In the afternoon of July 27, James Andrews and his son were fishing from the Pensacola Bay bridge. Around 3:30 p.m., Andrews hooked a human body that was wrapped in a sheet, a shower curtain, and masking tape. Law enforcement was called to retrieve the body, which the parties stipulated was Cynthia Campbell. After receiving word that Campbell's body had been found, Detective Donnie Wiggen went to the convenience store where he talked to Rodgers and retrieved a surveillance videotape showing that Grim had entered the store just after 2 p.m.
Law enforcement officers secured Grim's house. Davis drove to the Pensacola Bay fishing bridge and was present when Campbell's body was brought to shore. Davis testified that her body was wrapped in striped sheets, which the police determined belonged to Grim, and black garbage bags. When the bags and sheets were removed at the autopsy, Davis observed *458 that a piece of green carpet was "wrapped up with everything else." Davis recalled having seen a similar piece of green carpet hanging over the rail of Grim's back porch. Thereafter, the police obtained a search warrant for Grim's home and an arrest warrant.
Crime scene analyst Janice Johnson from the Florida Department of Law Enforcement attended Campbell's autopsy conducted by Dr. Michael Berkland, a forensic pathologist. Johnson testified that under the black garbage bags, the body was wrapped in carpet and sheets. They had to remove "layers of material," including the garbage bags, a floral sheet, a blue striped flat sheet and fitted sheet, a piece of green carpet, masking tape, and rope.
Dr. Berkland testified that Campbell's face was covered with deep abrasions and contusions around both eyes, her forehead, both sides of her chin, and her lips, all of which Dr. Berkland described as blunt force trauma. There was additional blunt force trauma to both shoulders and to the head. These injuries were all consistent with having been inflicted by a hammer. Dr. Berkland testified that Campbell suffered eleven stab wounds to the chest, seven of which penetrated her heart, and were consistent with having been caused by a single-edged weapon like a knife. Dr. Berkland opined that the blows to the head preceded the stabbings to the chest and that Campbell's death was caused by blunt force trauma to the head and multiple stab wounds to the chest.
After attending the autopsy, Janice Johnson went to the victim's home where she found no signs of any struggle. She then went to Grim's home where she found two damp mops in the kitchen that had suspected blood stains. Although the area appeared to have been cleaned, Johnson discovered small areas of blood on the floor of the kitchen and on the cabinets near the floor. Johnson collected a coffee mug from the kitchen counter and two bloody fingerprints on a trash bag box. Inside the kitchen trash can was a striped pillow case that appeared to have blood on it and that had the same pattern as one of the sheets found wrapped around Campbell's body. In the dining room, Johnson collected additional samples of suspected blood from the window frame and from the floor. In the living room, Johnson seized a pair of athletic shoes and a rope which appeared to be consistent with the rope found on the victim's body. Johnson also collected a pair of blue-jean shorts with bloodstains on them.
On the back porch, Johnson found a piece of green carpet draped over the rail which was consistent with the green carpet wrapped around the victim's body. Johnson also found a cooler in which she found a steak knife, a piece of terry cloth with reddish-brown stains on it, a pair of Hanes underwear, a tampon with reddish-brown stains on it, a pair of prescription eyeglasses, a wristwatch with a broken band, masking tape, a blue and white striped pillowcase, a hammer with suspected blood, some cloth tissue, and a Bud Lite beer carton.
Grim was arrested in Oklahoma on July 31, 1998. Detective Davis flew to Oklahoma to pick him up, to retrieve the clothes he had been wearing, and to arrange for the return of Grim's car.
The prescription glasses found in the cooler matched Campbell's prescription records, and the roll of masking tape in the cooler was fracture-matched to the tape found on Campbell's body. The rope and the green carpet found on Campbell's body were compared to the rope and green carpet found at Grim's home. Although the examiner was unable to fracture-match these pieces, he determined that they were identical in appearance, construction, and *459 fiber type and could have originated from the same source. Fingerprints on the coffee cup found on Grim's kitchen counter were identified as Cynthia Campbell's, and the bloody fingerprints on the trash bag box were identified as Grim's.
DNA analysis of stains on the cut-off jean shorts Grim was wearing when arrested revealed twelve genetic markers consistent with the DNA of Cynthia Campbell, and the steak knife found in Grim's cooler yielded six genetic markers consistent with the victim. The hammer found in the same cooler also yielded genetic markers consistent with the victim, as did swabbings from the box of trash bags. Likewise, stains on a pair of blue-jean shorts and a pair of shoes found in Grim's living room bore genetic markers consistent with those of the victim.
After the presentation of evidence during the guilt phase, the jury returned a verdict of guilty on the charges of first-degree murder and sexual battery upon a person twelve years of age or older with the use of a deadly weapon. In light of the fact that Grim continued to insist on waiving his right to present mitigating evidence during the penalty phase, and, in fact, ordered his attorneys not to present any mitigation, the trial court conducted a hearing pursuant to Koon v. Dugger, 619 So.2d 246 (Fla.1993).[2] During the hearing, the trial judge determined that Grim freely, voluntarily, and knowingly entered into his decision to waive mitigation and announced that he would conduct the penalty phase before the jury where Grim still could, if he wished, present mitigating evidence. Afterward, the judge stated that he would conduct a Spencer hearing[3] and order a presentence investigation report and, if necessary, he would also appoint an independent or special counsel to present mitigating evidence to the court outside the presence of the jury.
At the penalty phase, the State introduced certified copies and testimony relative to Grim's prior Florida convictions: (1) unarmed robbery; (2) kidnapping and robbery; (3) armed burglary and aggravated battery; and (4) armed burglary and armed theft. The State's last witness was the victim's mother, Dorothea Campbell, who read a short victim impact statement. Grim did not present any mitigating evidence, and the jury recommended the death penalty by a vote of twelve to zero.
At the sentencing hearing, Grim's attorneys were present before the court, along with Spiro Kypreos, special counsel appointed by the trial court to investigate and present mitigation. Grim insisted on not presenting any mitigation and so instructed his attorneys. Defense counsel confirmed Grim's waiver of mitigation, and the trial court found that Grim, against the advice of his counsel, freely and voluntarily decided not to present mitigating evidence.
During sentencing, the State presented its sentencing memorandum to the court, along with depositions from the following persons: Grim's mother, stepfather, and sister, a coworker, a supervisor, and psychologist Dr. James Larson. Defense counsel objected to the attachment of Dr. Larson's deposition because it provided mitigation that Grim did not want presented.
Before there was any presentation of mitigating evidence at the sentencing hearing, defense counsel objected to special counsel Kypreos's presentation, particularly to Dr. Larson's interview with Grim.
*460 The trial court denied the objection. Thereafter Kypreos offered in mitigation a presentence report and a psychological report from court proceedings occurring in 1982, a 1983 letter from Grim's public defender in those cases, and a written description of intermittent explosive disorder taken from the Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000). Kypreos also presented testimony from Grim's sister relative to his family life and childhood and two of Grim's work supervisors regarding his work ethic.
In its written order, the trial court found that the State established three aggravating circumstances beyond a reasonable doubt: (1) the murder was committed by a person under sentence of imprisonment; (2) the defendant had prior convictions for violent felonies; and (3) the murder was committed while the defendant was engaged in the commission of a sexual battery. The trial court found the following statutory mitigating circumstances pursuant to section 921.141(6)(h), Florida Statutes (1997):(1) disruptive home life and child abuse (given significant weight); (2) hard-working employee (given significant weight); and (3) mental health problems that did not reach the level of section 921.141(6)(b), Florida Statutes (1997) (given great weight). The trial court also considered seventeen nonstatutory mitigators. Because many were subsumed within the statutory mitigation and thus already considered, the trial court considered the following remaining nonstatutory mitigators: (1) lack of long-term psychiatric care (no weight); (2) marital problems and situational stresses (great weight); (3) errors of judgment under stress (no additional weight); (4) model prison inmate (some weight); and (5) entered prison at a young age (given little weight). The trial court ordered and adjudicated Grim guilty of first-degree murder and sentenced him to death. The court also found Grim guilty of sexual battery upon a person twelve years of age or older with the use of a deadly weapon and sentenced him to 390.5 months in state prison to run consecutively to the death sentence.

APPEAL
On appeal Grim raised three claims of error. In his initial issue on appeal, Grim argues two subissues. First, he contends that despite the mitigation presented to the trial court, it erred by giving great weight to the jury's recommendation even though the jury was never presented mitigation in the penalty phase. Second, he asserts that the trial court should have required special counsel to present mitigation evidence to the penalty phase jury notwithstanding the defendant's knowledgeable waiver. We disagree on both subissues.
In Muhammad v. State, 782 So.2d 343 (Fla.), cert. denied, 534 U.S. 836, 122 S.Ct. 87, 151 L.Ed.2d 49 (2001), and cert. denied, 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001), the defendant Muhammad discharged his penalty phase counsel and did not present any mitigating evidence. In its instructions to the penalty phase jury, the trial court stated that "[y]our advisory sentence as to what sentence should be imposed on this Defendant is entitled by Law and will be given great weight by this Court in determining what sentence to impose in this case." Id. at 363 n. 9. Thereafter the jury returned a recommended sentence of death. At the sentencing hearing, the trial court considered mitigating circumstances contained in the presentence investigation report which were not presented to the jury. The trial court imposed a death sentence indicating in its sentencing order that "[t]his Court must give great weight to the jury's sentencing recommendation." Id. at 362. This Court reversed for a new penalty *461 phase and found that "the trial court erred when it gave great weight to the jury's recommendation in light of Muhammad's refusal to present mitigating evidence and the failure of the trial court to provide for an alternative means for the jury to be advised of available mitigating evidence." Id. at 361-62.
In the present case, the State introduced evidence of aggravating circumstances in the penalty phase; however, Grim did not present any mitigating evidence. During the Koon hearing, the trial judge specifically warned Grim that he, as the sentencing judge, must give great weight to any recommendation by the jury. The trial court also instructed the jury that its advisory sentence would be given great weight. Thereafter, the jury returned a recommendation of death.
In its sentencing order the trial court recognized, unlike the trial court in Muhammad, that the penalty phase jury did not have the benefit of hearing mitigation:
First, as a general matter of law, a jury's recommendation of life or death must be given great weight. The jury in this case unanimously recommended death, but it did not have the benefit of receiving mitigating evidence from the Defendant or the benefit of his counsel arguing the evidence and applicable law.
Moreover, the trial judge considered two separate paths in sentencing Grim. In considering the jury's recommendation, the judge recognized and considered the fact that in making its recommendation the jury did not have the benefit of hearing mitigating evidence. The judge therefore independently weighed the aggravating and mitigating circumstances as noted in his sentencing order:
Thus, in reaching its sentencing decision, this Court has assiduously followed the two separate paths recognized by law. It has duly considered the jury recommendation. But it has also independently weighed the aggravating and mitigating circumstances. Both paths have led to the same point.
We find this case distinguishable from Muhammad and conclude that the trial court properly sentenced Grim despite the lack of mitigation presented for the jury's consideration in the penalty phase.[4]
In the second subissue, Grim asserts that the trial court should have required special counsel to present mitigating evidence to the penalty phase jury notwithstanding the defendant's vocal objection.[5] In Hamblen v. State, 527 So.2d 800 (Fla.1988), we determined that a defendant cannot be forced to present mitigating evidence during the penalty phase of the trial. We reasoned that "all competent defendants have a right to control their own destinies" within the ambit of the rights, responsibilities, and procedures set forth in the constitution and statutes. Id. at 804. We therefore continue to hold that a trial court should not be required to appoint special counsel for purposes of presenting mitigating evidence to a penalty phase jury if the defendant has knowingly and voluntarily waived the presentation of such evidence. See Nixon v. Singletary, 758 So.2d 618, 625 (Fla.) ("[T]he defendant, not the attorney, *462 is the captain of the ship."), cert. denied, 531 U.S. 980, 121 S.Ct. 429, 148 L.Ed.2d 437 (2000); Koon v. Dugger, 619 So.2d 246 (Fla.1993); Farr v. State, 621 So.2d 1368 (Fla.1993).
In his second issue on appeal, Grim asserts that the trial court abused its discretion in failing to call Dr. James Larson as its own witness to establish two mental statutory mitigating factors in light of defense counsel's proffered evidence that Dr. Larson's testimony could establish those mitigators.[6] We disagree.
Mitigating evidence must be considered and weighed when contained "anywhere in the record, to the extent it is believable and uncontroverted." Robinson v. State, 684 So.2d 175, 177 (Fla. 1996). This duty extends to cases where the defendant argues in favor of the death penalty or where the defendant asks the trial court not to consider mitigating evidence. See Farr, 621 So.2d at 1369. "[T]he trial judge must carefully analyze all the possible statutory and nonstatutory mitigating factors against the established aggravators to ensure that death is appropriate." Robinson, 684 So.2d at 177. If a defendant chooses not to submit proof of mitigating circumstances, the trial court is not required to accept potential mitigating circumstances as proven based on defense counsel's proffer of evidence. See Chandler v. State, 702 So.2d 186, 199-201 (Fla. 1997). Proffered evidence is merely a representation of what evidence the defendant proposes to present and is not actual evidence. See State v. Warner, 721 So.2d 767, 769 (Fla. 4th DCA 1998) ("[A] proffer is not evidence ...."), approved on other grounds, 762 So.2d 507 (Fla.2000). Because Grim waived the presentation of mitigation during the penalty phase in the present case, we conclude that he cannot complain on appeal that the trial court abused its discretion by not calling Dr. Larson as its own witness to testify relative to two possible mental statutory mitigators. See LaMarca v. State, 785 So.2d 1209 (Fla.), cert. denied, 534 U.S. 925, 122 S.Ct. 281, 151 L.Ed.2d 207 (2001) (holding that the trial court properly declined to evaluate proffered mitigation evidence during sentencing because the defendant had waived the presentation of mitigating evidence).
In his third issue on appeal, Grim asserts that the trial court abused its discretion and violated his due process rights when it refused to allow him to present his only defensethe victim's hearsay statements to Jan Wallace and Charles Worrel demonstrating that someone else could have killed Cynthia Campbell. We disagree.
Before trial, defense counsel filed a notice of intent to introduce victim hearsay statements and a supporting memorandum of law. The trial court denied the motion by written order and found the proffer insufficient to establish that the victim's statements to Wallace qualified as an excited utterance. The court also found no other hearsay exception applicable and noted that threats to the victim by a third person were inadmissible in the absence of other evidence tending to connect such person to the crime.
Wallace's proffered testimony demonstrated that she was employed by the victim as her paralegal for a week and a half in the early summer of 1998. Sometime during that week, the victim Campbell was supposed to have met with representatives *463 from Henry Company Homes. Upon her return from this meeting, Campbell appeared upset and told Wallace that one of the people she was supposed to meet had not shown up and that she had been forced to crawl into the attic to inspect a crack and had gotten sweaty, hot, and dirty. Campbell also reported to Wallace that the person who was in the attic with her told her she was "putting her nose where it didn't belong, and she was going to find herself dead in the bay if she continued." Campbell then told Wallace, "If I ever end up dead in the bay, point your finger at Henry Homes." Wallace testified that Campbell did not appear to be upset by the threat and laughed it off. Wallace was not sure how much time had elapsed between the threat and the victim's statements to her and that she was not sure of the identity of the person who was present at the meeting, or whether that person was an employee or representative of Henry Company Homes. The trial court adhered to its previous ruling and denied the admissibility of the hearsay statements.
Before the State rested in the guilt phase, defense counsel proffered the testimony of Charles Worrell who stated that Campbell represented him in litigation against Henry Company Homes. Worrell testified that Campbell told him that threats had been made against her life as the result of her litigation against Henry Company Homes, that he had not heard any threats personally, and that Campbell did not identify by name anyone who had been threatening her. The trial court denied the admission of Campbell's hearsay statements to Worrell.
Even though the trial court did not allow the testimony of Wallace or Worrell, it permitted defense counsel to cross-examine Corporal Davis before the guilt phase jury relative to his investigation of information that Henry Company Homes had threatened the victim. Defense counsel asked Davis if he recalled a report indicating that Henry Company Homes might have been responsible for Cynthia Campbell's death. Davis answered affirmatively and testified that Detective Wiggen, who investigated the report, found no merit to the report. Davis testified that he did not personally conduct the investigation and had no further knowledge of it.
Appellate defense counsel conceded at oral argument and we agree that the proffered testimony of Wallace and Worrell was insufficient to establish the prerequisites for admitting the victim's statements as an excited utterance,[7] a spontaneous statement[8] or as a statement relating to the declarant's state of mind.[9]See Stoll v. *464 State, 762 So.2d 870 (Fla.2000). No other justification appears for admitting this testimony. Defense counsel presented nothing other than hearsay reports that the victim had been threatened by representatives or employees from Henry Company Homes, Inc. There was no identification of the person or persons who made these threats, and no other evidence that implicated Henry Company Homes, Inc., or otherwise connected the company to Campbell's murder.
We reject Grim's contention that the hearsay testimony was reliable and thus should have been admitted for the purpose of establishing that someone other than Grim committed the murder. Grim's claim relies upon Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); however, he fails to recognize that in Chambers, the court held that the hearsay statements of a third person who orally confessed to the murder should have been admitted because the statements' reliability was clearly established. Id. at 300-01, 93 S.Ct. 1038; see also Sliney v. State, 699 So.2d 662 (Fla.1997); Lightbourne v. State, 644 So.2d 54 (Fla.1994). The same cannot be said for the hearsay statements at issue. Moreover, the trial court did, in fact, allow the defense to present evidence through Detective Davis's cross-examination that someone else could have possibly killed Campbell. We therefore conclude that the trial court did not abuse its discretion or violate Grim's due process rights when it denied the admission of the hearsay statements.

PROPORTIONALITY
Grim did not raise insufficiency of the evidence or proportionality on appeal. However, based on our independent obligation to review the record, we find the evidence sufficient to support each conviction. We further conclude that the death penalty is proportional. See, e.g., Darling v. State, 808 So.2d 145 (Fla.2002) (finding death sentence proportional where murder was committed while defendant was engaged in the commission of the crime of armed sexual battery, defendant had been previously convicted of felony involving the use or threat of violence to the person, and record did not support a finding of immaturity or significant mental deficiency); Bryant v. State, 785 So.2d 422 (Fla.), cert. denied, 534 U.S. 1025, 122 S.Ct. 557, 151 L.Ed.2d 432 (2001) (finding the sentence of death proportional where three aggravators of prior convictions for violent felonies, murder committed while engaged in the commission of a robbery, and avoidance of a lawful arrest or effecting an escape from custody outweighed the nonstatutory mitigator of remorse); Pope v. State, 679 So.2d 710 (Fla.1996) (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed two statutory mitigating circumstances of commission while under influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927 (Fla.1994) (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed some nonstatutory mitigation); Heath v. State, 648 So.2d 660 *465 (Fla.1994) (affirming defendant's death sentence based on presence of two aggravating factors of prior violent felony and murder committed during course of robbery, despite the existence of the statutory mitigator of extreme mental or emotional disturbance).
On rehearing, Grim has asserted that Florida's capital sentencing scheme violates the United States Constitution under the holding of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, ___ U.S.___, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, ___ U.S. ___, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. We likewise find that Grim is not entitled to relief on this claim. The aggravating circumstances which were present in this case included multiple convictions for prior violent felonies and a contemporaneous felony of a sexual battery, both of which were found unanimously by a jury. Moreover, by a twelve-to-zero vote, the jury recommended that the defendant be sentenced to death.

CONCLUSION
We affirm Grim's first-degree murder conviction and death sentence. We also affirm his conviction and sentence for sexual battery upon a person twelve years of age or older with use of a deadly weapon.
It is so ordered.
WELLS, LEWIS, and QUINCE, JJ., and SHAW and HARDING, Senior Justices, concur.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., specially concurring.
I concur in affirming the conviction and sentence. I write separately to add that in accordance with my concurrence in Muhammad v. State, 782 So.2d 343, 368-72 (Fla.2001), I would adopt a uniform procedure requiring the appointment of special counsel to present available mitigation:
Because of the tremendous responsibilities placed on the trial court and this Court in death penalty cases, rather than leave the appointment of counsel to the trial court's discretion on a case-by-case basis, I would thus adopt a prospective rule that would provide for the appointment of special counsel to present available mitigation for the benefit of the jury, the trial court and this Court in order to assist the judiciary in performing our statutory and constitutional obligations. This procedure, of course, would not prevent the defendant himself or herself from arguing in favor of the death penalty.
Id. at 370 (emphasis supplied). Nevertheless, in this case I agree that a reversal of the death sentence is not warranted because, unlike Muhammad, the trial court acknowledged that the jury did not have the benefit of the presentation of mitigating evidence and, unlike Muhammad, the trial court did appoint special counsel, who presented mitigating evidence to the trial court that the trial court weighed in its sentencing decision.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority's opinion in all respects except for the discussion and resolution of the Ring issue.
NOTES
[1] Deputy McCauley testified that it was blood.
[2] This hearing was a continuation of the Koon hearing conducted before the jury was chosen.
[3] See Spencer v. State, 615 So.2d 688 (Fla. 1993).
[4] Even though the trial judge in the present case was not required to comply with the procedures enunciated in Muhammad due to the fact that Grim's trial was completed before the Muhammad case was decided, we commend the trial judge for his insight in handling Grim's waiver of mitigation.
[5] Even though special counsel was not appointed to present mitigation during the penalty phase, the trial court did, in fact, appoint special counsel to present mitigation during the sentencing hearing.
[6] The two statutory mitigators were: (1) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) the capacity of the defendant to conform his or her conduct to the requirements of law was substantially impaired.
[7] An excited utterance is "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." § 90.803(2), Fla. Stat. (1999).
[8] A spontaneous statement is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness." § 90.803(1), Fla. Stat. (1999).
[9] Section 90.803(3), Florida Statutes (1999), provides for admission of testimony as to the following matters:

(3) Then-existing mental, emotional, or physical condition.
(a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
(b) However, this subsection does not make admissible:
1. An after-the-fact statement of memory or belief to prove the fact remembered or believed, unless such statement relates to the execution, revocation, identification, or terms of the declarant's will.
2. A statement made under circumstances that indicate its lack of trustworthiness.