# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D22-2671
LT Case No. 2019-CA-002883-11J-L

_____

FAYE CRUMP,

Appellant,

v.

AMERICAN MULTI-CINEMA, INC.
d/b/a AMC,

Appellee.

_____

Nonfinal appeal from the Circuit Court for Seminole County.
Jessica J. Recksiedler, Judge.

Josef Timlichman, of Josef Timlichman Law, PLLC, Aventura, for
Appellant.

R. David McLaughlin, and Michael W. LeRoy, of Fulmer LeRoy &
Albee, PLLC, Orlando, for Appellee.

March 28, 2024

SOUD, J.

Appellant Faye Crump appeals the trial court's denial of her
motion for leave to assert a claim for punitive damages in her
underlying personal injury action against American Multi-Cinema
d/b/a AMC. We have jurisdiction. *See* Art. V, § 4(b)(1), Fla. Const.;
Fla. R. App. P. 9.130(a)(3)(G). We affirm, concluding the trial court

properly denied the motion because there is no reasonable evidentiary basis for the recovery of such damages.

## I.

Crump and her friend went to the movies at the AMC theater in Altamonte Springs, Florida on February 24, 2018. While they were inside Theater 11, which was "packed" because of a popular movie having recently opened, an individual in the parking lot fired a gun at a car passing by. As a result, approximately 300 to 400 people fled the parking lot area in front of the theater building, many of whom entered the theater lobby.

Relatedly, Crump heard someone in Theater 11 loudly say, "Get out." She then described "a herd of people" from the other side of the theater running and screaming. Crump testified at her deposition that she could not remember any other specific words because she "went into shock and didn't know what was happening." Crump did not see anyone she could identify as an AMC employee inside the theater at that time. As people began to run out of the theater, Crump fell and was stepped on by others fleeing the theater. She testified she became dazed and blacked out.

According to Crump's friend, Gary Capers, approximately ten minutes after the movie started, a female AMC employee "busted in the door" of Theater 11 loudly yelling, "Everybody has to leave. Get out. Get out." Capers then stood up and told Crump they needed to leave. Before Crump could react, the crowd pushed Capers out the door. Capers lost sight of Crump and did not see her again until Crump exited the theater about thirty minutes later. Capers did not hear the female employee say anything about a shooting or a shooter.

Initially, when the gun shots were fired, AMC General Manager Thomas Stauffenberg heard a manager "scream[]" on the handheld radio carried by employees "gun shots fired." When Stauffenberg asked him to repeat the statement, the manager said, "Gun shots fired. Gun shots fired. Active shooter." All radios carried by employees had earpieces that were connected to the handheld radios so that patrons at the theater could not hear the radio transmission.

2

Elizabeth Gerson was one of two female AMC employees[1] who entered Theater 11 where Crump was seated. While the movie was playing and the lights were off, the other female employee excitedly entered the theater and, according to Gerson, yelled "Emergency, we need to leave the theater." Gerson testified at her deposition that when the other AMC employee did so, the patrons did not panic but became "alert." However, immediately thereafter, a male individual—a guest who was not believed to be an AMC employee—shouted, "Active shooter,"[2] which caused everyone to panic and begin running and stumbling over each other. Gerson herself was injured.

Gerson believed her colleague's conduct violated AMC's policy, which she understood at that time[3] to require employees to calmly ask moviegoers to remain in their seats because that would cause less panic. She also testified that she believed AMC could have provided more training.

AMC conducted required emergency operations training for all its employees every six months. Such training covered "all emergency evacuation systems," including all weather-related occurrences, guest service issues, power outages, bomb threats, and active shooters. Training specific to active shooter scenarios was provided in AMC's "electronic learning classes or modules," which every employee was required to watch every six months. Following completion of the electronic learning module, employees were required to answer a series of assessment questions, answering a minimum of eighty percent correctly. AMC's instruction to its employees involving an active shooter scenario

---

[1] Gerson is no longer employed at AMC.

[2] Nobody in Theater 11, other than this unidentified male, described the situation as involving an active shooter.

[3] According to Gerson, AMC's policy changed during her employment. When she first began working, the policy was for employees to calmly ask people to follow them as the employee led them out of the theater. Then, the policy changed to as it existed on the day of the incident, where an employee was to ask patrons to remain in their seats.

included that as they flee, "assist others if it is safe to do so." Employees also practiced emergency routines in the theaters where they learned to assist guests during other types of emergencies.

Ultimately, and perhaps, in as little as thirty seconds after Stauffenberg was notified over the radio of the gunshots, Clark Irrizarry, the security guard working the premises, subdued the identified shooter outside and held him on the ground until law enforcement authorities arrived at the theater.

Crump filed the underlying lawsuit in September 2019, claiming she sustained injuries during the episode as a result of AMC's negligence. On July 25, 2022, pursuant to section 768.72, Florida Statutes, and Florida Rule of Civil Procedure 1.190(f), she filed a motion for leave to amend her complaint to add a claim for punitive damages for AMC's alleged gross negligence. AMC filed its response to the motion that same day and filed the deposition transcripts of Crump, Capers, Gerson, Stauffenberg, and Irrizarry just two days thereafter on July 27, 2022. Following a hearing on September 7, 2022, at which no testimony was taken, the trial court denied Crump's motion in a written order filed October 7, 2022.[4] This appeal followed.

## II.

We review de novo the trial court's order denying Crump's motion seeking leave to assert a claim for punitive damages. *See Hosp. Specialists, P.A. v. Deen*, 373 So. 3d 1283, 1287 (Fla. 5th DCA 2023) (citing *Werner Enters., Inc. v. Mendez*, 362 So. 3d 278, 281 (Fla. 5th DCA 2023)). In doing so, we view any record or proffered[5] evidence in the light most favorable to the moving

---

[4] Given the procedural history of this case, Crump's arguments objecting to the timeline of the hearing on her motion to amend do not warrant reversal.

[5] "'Proffered evidence is merely a representation' of the evidence that a party proposes to present at trial." *Werner Enters.*, 362 So. 3d at 281 (citing *Grim v. State*, 841 So. 2d 455, 462 (Fla. 2003)).

plaintiff. *Hosp. Specialists*, 373 So. 3d at 1287 (citing *Est. of Blakely by and through Wilson v. Stetson Univ., Inc.*, 355 So. 3d 476, 481 (Fla. 5th DCA 2022)).

## A.

A plaintiff's ability to assert a claim for punitive damages is substantively governed by section 768.72, Florida Statutes. "[N]o claim for punitive damages shall be permitted unless there is a *reasonable showing* by evidence in the record or proffered by the claimant which would provide a *reasonable basis* for recovery of such damages." § 768.72(1), Fla. Stat. (2017) (emphasis added). This statute creates for a defendant "a substantive legal right not to be subject to a punitive damages claim . . . until the trial court makes a determination that there is a reasonable evidentiary basis for recovery of punitive damages." *Globe Newspaper Co. v. King*, 658 So. 2d 518, 519 (Fla. 1995); *see also Hosp. Specialists,* 373 So. 3d at 1287 (citing *Globe Newspaper,* 658 So. 2d at 519). Accordingly, a plaintiff may not assert a claim for punitive damages in an initial complaint. Rather, a plaintiff must "seek the trial court's permission before adding punitive damages to its complaint." *Werner Enters.,* 362 So. 3d at 281.

In requesting leave of court to add a claim for punitive damages, Florida Rule of Civil Procedure 1.190 requires a plaintiff to file a motion for leave to amend the complaint. *See* Fla. R. Civ. P. 1.190(a) and (f). The motion must attach the proposed amended complaint, *see Varnedore v. Copeland*, 210 So. 3d 741, 745 (Fla. 5th DCA 2017), which must plead sufficient allegations for the recovery of punitive damages. "Given the nature of the applicable statute and rule, the court must consider both the pleading component and the evidentiary component of each motion to amend to assert punitive damage claims." *Id.* at 744 (citing *Henn v. Sandler*, 589 So. 2d 1334, 1335–36 (Fla. 4th DCA 1991)).

In deciding whether to permit a claim for punitive damages, the trial court acts as "a 'gatekeeper' to assess whether the claimant has shown a reasonable evidentiary basis for the recovery of punitive damages." *Hosp. Specialists,* 373 So. 3d at 1287 (quoting *Varnedore*, 210 So. 3d at 745). In so doing, the trial court "must first consider whether the proposed amended complaint actually sets forth a claim that the defendants' conduct was grossly

5

negligent, as defined by" section 768.72. *Varnedore*, 210 So. 3d at 745. "Absent sufficient allegations, there would be neither a reason nor a framework for analyzing the proffered evidentiary basis for a punitive damages claim." *Id.* The trial court's gatekeeping function "similarly tasks the trial court with preventing a party from being subjected to a punitive damages claim when no reasonable [evidentiary] basis for these damages has been shown." *Hosp. Specialists*, 373 So. 3d at 1288.

By the plain language of section 768.72, punitive damages[6] are permissible "only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." § 768.72(2), Fla. Stat. Further, in Florida, a corporation or employer may become liable for punitive damages for the conduct of an employee or agent "only if" the employee's conduct constitutes intentional misconduct or gross negligence as defined by the statute *and* the employer "actively and knowingly participated in such conduct[,] . . . knowingly condoned, ratified, or consented to such conduct[,] or . . . engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by" a plaintiff. *See* § 768.72(3), Fla. Stat.; *see also Wells Fargo Bank, N.A. v. Elec. Funds Transfer Corp.*, 326 So. 3d 753, 757 (Fla. 5th DCA 2021) (citing *Schropp v. Crown Eurocars, Inc.*, 654 So. 2d 1158, 1159 (Fla. 1995)).

"'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a), Fla. Stat. The term "gross negligence" is defined as conduct "so reckless or wanting in care that it constituted a conscious disregard or

---

[6] As its name suggests, punitive damages are not designed to compensate a plaintiff for sustained damages. Rather, such damages "are private fines levied by civil juries to punish *reprehensible conduct* and to deter its future occurrence." *Hosp. Specialists,* 373 So. 3d at 1288 (citations omitted).

indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b), Fla. Stat.

As we noted in *Hospital Specialists,* "the Florida Supreme Court has analogized the requisite level of negligence necessary for the assessment of punitive damages under section 768.72 to that necessary for a conviction for criminal manslaughter." *Hosp. Specialists,* 373 So. 3d at 1288 (citing *Valladares v. Bank of Am. Corp.,* 197 So. 3d 1, 11 (Fla. 2016)).

> The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."

*Valladares*, 197 So. 3d at 11 (quoting *Owens–Corning Fiberglass Corp. v. Ballard,* 749 So. 2d 483, 486 (Fla. 1999)).

B.

As Florida's law makes clear, the burden placed upon Crump to allow her to amend her complaint to add a claim for punitive damages, is—substantively speaking—not a modest one. She must demonstrate a reasonable evidentiary basis that AMC's conduct was (as prior Florida precedent has described it) reprehensible, gross and flagrant, reckless and wanton, and of such a nature that it demonstrates a careless disregard for the life and safety of others. She must proffer evidence that demonstrates the alleged negligence reaches a level akin to that needed to sustain a conviction for *criminal manslaughter*. And until Crump does so, AMC has the legal right not to be subjected to a punitive damages claim (and the discovery related thereto). *See Globe Newspaper*, 658 So. 2d at 519.

7

Crump filed her motion to amend her complaint to add a claim for punitive damages, in essence claiming that AMC was grossly negligent in failing to adequately train its employees and ensure that AMC's policies and procedures were followed so as to prevent the panic and confusion that injured her.[7] The allegations set forth in the proposed amended complaint fall short of the gross negligence necessary for her punitive damages claim to proceed. Additionally, Crump fails to make a reasonable showing from the evidence presented to the trial court that demonstrates any reasonable basis for the award of such damages. Simply stated, Crump cannot meet her burden here.

Initially, we conclude that the allegations pleaded in Crump's proposed amended complaint do not rise to the level of gross negligence as defined by section 768.72. Crump's allegations against AMC cannot constitute tortious conduct "so *reckless or wanting in care* that it constituted a *conscious disregard or indifference* to" Crump's life, safety, or rights. *See* § 768.72(2)(b), Fla. Stat. (emphasis added). Stated differently, in no way can the alleged negligence reasonably be determined to be similar in nature to that necessary to convict someone of criminal manslaughter. *See Hosp. Specialists,* 373 So. 3d at 1288 (citation omitted).

Further, even assuming *arguendo* the legal sufficiency of the proposed amended complaint, Crump fails to make a "reasonable showing" of a "reasonable basis" for the recovery of punitive damages, as required by section 768.72. First, as to any claim of AMC's vicarious liability for punitive damages because of the

---

[7] Crump's motion at times appears to vacillate between allegations of intentional misconduct and gross negligence. However, consistent with the proposed Amended Complaint including the desired punitive damages claim attached to Crump's motion, the trial court's order makes clear that Crump seeks punitive damages "solely . . . based upon an allegation that the negligence was a gross negligence that occurred." In any event, there is utterly nothing before the trial court to provide any reasonable basis for a jury to find intentional conduct by AMC as defined by section 768.72.

8

conduct of its employees, the actions of AMC's employees at the time immediately after the shots were fired in the parking lot area simply do not rise to the level of gross negligence. Viewing the evidence in the light most favorable to Crump, as we must, AMC's female employee "bursting" into the theater and "yelling" something to the effect of "Emergency. Everybody has to leave. Get out. Get out."—even if determined by a jury to be negligent and contrary to AMC's policies—does not provide a reasonable evidentiary basis for a finding of "gross negligence" as defined by the statute. It cannot be reasonably shown that such conduct rises to the level of being "so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of" Crump. *See* § 768.72(2)(b), Fla. Stat. The proffered evidence fails to make any reasonable showing of conduct that is reprehensible, flagrant, reckless and wanton, and demonstrating a careless disregard for Crump. Additionally, there is no evidence before the court that AMC "actively and knowingly participated in such conduct[,] . . . [or] knowingly condoned, ratified, or consented to such conduct[.]" *See* § 768.72(3), Fla. Stat. Indeed, the argument set forth by Crump, that the employees' conduct in evacuating the theater violated AMC's policies, precludes a reasonable evidentiary basis that AMC participated in the conduct or otherwise condoned, ratified, or consented to the conduct.

Undoubtedly, the shooting outside in the parking lot sparked panic at the AMC theater that seems to have ultimately made its way into Theater 11. In such a setting of confusion and concern, the conduct of AMC's employees—even if determined negligent—simply does not set forth any reasonable evidentiary basis for the imposition of punitive damages.

Finally, as to any claim of AMC's direct liability for punitive damages because of an alleged failure to adequately train its employees, there is no reasonable evidentiary basis for a jury to conclude that AMC itself "engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by" Crump. *See* § 768.72(3), Fla. Stat. AMC required its employees to complete emergency operations training every six months, covering such topics as weather-related occurrences, guest service issues, power outages, bomb threats, and active shooters. Pertinent to the case *sub judice*, employees

9

were required to complete mandatory "electronic learning classes or modules" every six months, which provided training for active shooter scenarios. This required training included the employees' obligation to answer a series of assessment questions, answering a minimum of eighty percent correctly. This training instructed AMC employees as they flee to "assist others if it is safe to do so."

While the employees are alleged to have violated those policies in the sudden burst of gunshots, there simply is inadequate evidence proffered to the trial court from which a jury could have a reasonable basis to award punitive damages against AMC based on its own gross negligence.

## III.

Accordingly, as Crump failed to both (i) plead sufficient allegations for the recovery of punitive damages and (ii) make a reasonable showing by the proffered evidence of a reasonable basis by which a jury could award punitive damages against AMC, *see* § 768.72(1), Fla. Stat., the trial court properly denied Crump's motion for leave to assert a claim for punitive damages. Therefore, the order of the trial court is AFFIRMED.

It is so ordered.

EDWARDS, C.J., and MAKAR, J., concur.

———————————————

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

———————————————