# Supreme Court of Florida

———————

No. SC14-990
———————

**HENRY LEE JONES,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 2, 2017]

PER CURIAM.

Henry Lee Jones appeals his conviction for the first-degree murder of Carlos

Perez and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla.

Const. For the reasons explained below, we affirm.

## I. BACKGROUND

On August 27, 2003, the body of nineteen-year-old Carlos Perez was found

in a motel room in Melbourne, Florida. Jones was indicted for the murder in 2011.

Jones waived his right to counsel and represented himself at his 2013 trial, after

which the jury returned a verdict of guilty of first-degree premeditated murder and

unanimously recommended a sentence of death. Following a hearing held

pursuant to Spencer v. State, 615 So. 2d 688 (Fla. 1993), in 2014, the trial court followed the jury's recommendation and sentenced Jones to death. This appeal follows.

## A. Guilt Phase

The evidence presented during the guilt phase of Jones's trial established the following. In August 2003, Carlos Perez was living with his father, William Perez, in Wilton Manors, Florida, and working for Dependable Temps, a labor pool in Fort Lauderdale. On August 26, 2003, Perez left for work at 4:30 a.m. and never returned. The next day around noon, housekeeping staff at the Super 8 motel in Melbourne discovered Perez's body rolled up in a comforter on the bed in room 217. His head was covered with a pillow and there was a significant amount of blood on the pillows, headboard, and comforter. It was clear that Perez had been strangled and his throat was slashed.

There were no personal effects in the room and all the towels, washcloths, and pillow cases were missing. The telephone cord had been removed from the back of the phone, and a section of it had been cut out and was missing from the room. A hair on the carpet was later determined to have a mitochondrial DNA profile that matched Jones's mitochondrial DNA profile, and footwear impressions from the bathroom floor were determined to be consistent with—and one of them most likely made by—shoes that were found in Jones's car.

Dr. Sajid Qaiser, the medical examiner who performed the autopsy on Perez, confirmed that the cause of death was strangulation with a ligature and multiple incised wounds to the neck. Perez suffered a total of eight incised wounds to the neck, ranging from superficial to fatal. The largest wound was a large, gaping slash that severed the windpipe, cut through muscles and the larynx, and reached deep enough to damage the front of the cervical bones at the back of the neck. Although no ligatures were found on Perez's body, there were ligature marks around his neck, wrists, and ankles. Contusions on Perez's ankles and forearms were caused by hurried removal of the ligatures after death. Petechiae in Perez's eyes indicated that the neck ligature was tightened and released several times before Perez died. Perez's anal area was dilated and abraded and his rectum was filled with mucus, which indicated that he was sexually abused and penetrated either by an object or another person's penis at or near the time of his death. According to Dr. Qaiser, the petechial hemorrhaging and sexual penetration indicated that Perez had been subjected to sexual asphyxia, which Dr. Qaiser described as a practice involving the application and release of pressure to the neck in order to enhance the sexual pleasure or excitement of one of the parties.

As to the sequence of Perez's injuries, Dr. Qaiser opined that Perez was laid face down, his hands were tied at the wrists, his legs were tied at the ankles, and then the sexual penetration occurred. The ligature was applied to the neck and was

tightened and released multiple times. The perpetrator then inflicted multiple superficial, incised wounds to the neck that would have been painful and bled a small amount. The cutting to the neck then got deeper and deeper until finally the neck was slashed and the windpipe, jugular vein, vertebral bone, and muscles were cut.

Detectives from the Melbourne Police Department assigned to the case initially identified Perez from the driver license he used to check in to the motel. According to the front desk clerk, Perez checked in around noon on August 26, 2003, and paid cash for one night. Around the time Perez checked in, the manager of the motel observed a white, four-door car with two men inside pull into the parking lot. A young, white male got out and entered the lobby check-in area. The driver, a black male, waited for the white male to return to the car after checking in, and the men then entered the motel together through a side entrance.

Early in the investigation, Detective Johnny Lawson learned that the Brevard County Sheriff's Office was investigating the use of a credit card in Brevard County a few days before the Perez murder that was stolen from Lillian James, one of the victims of a double homicide that occurred in Bartlett, Tennessee, on August 22, 2003. Although there was no immediate connection between those crimes and the Perez murder, Detective Lawson made a "courtesy call" to police in Bartlett and later reviewed surveillance video from the gas station where Mrs. James's

stolen credit card was used in Brevard County, which depicted the driver of a white 1993 Lincoln Town Car using the stolen card.

On September 4, 2003, Detective Lawson and other Melbourne detectives traveled to Fort Lauderdale to visit Perez's employer, Dependable Temps, in order to gather records and speak to the management and other labor-seekers. Records from Dependable Temps showed that Perez signed in on the morning of August 26, 2003, but was not assigned to a job that day.

As the detectives spoke to the labor-seekers arriving that morning, Detective Lawson noticed a white Lincoln Town Car parked in front of the building that looked very similar to the one on the video of the transaction in which Mrs. James's stolen credit card was used in Brevard County. Detective Lawson ran the tag on the Town Car, which was "69 BAM." The search revealed that the tag belonged to Henry Lee Jones. Detective Lawson also discovered that Jones was stopped and cited by the Rockledge Police Department in Brevard County for driving while his license was suspended on August 15, 2003, which was eleven or twelve days before Perez's murder. The report from the August 15 stop indicated that Jones was driving a white, four-door Dodge Aries with tag number "W58 JKP" at the time. Jones's passenger at the time of the stop—K.F., a seventeen-year-old runaway from Illinois—had a valid driver's license and was allowed to drive the car away from the stop after Jones received his citation. When Detective

Lawson ran the W58 JKP tag, he learned that the Dodge Aries was stopped again on I-95 in Brevard County on August 25, 2003, by Agent Carlos Reyes, only a few miles from where Mrs. James's stolen credit card was used the day before.

When Agent Reyes stopped the Dodge Aries on August 25, 2003, for speeding, changing lanes without a signal, and following too close to other vehicles, the driver was Tevarus Young. Young initially gave Agent Reyes a false name and said that he was following and attempting to catch up to his stepfather, who was driving a Lincoln Town Car. A few minutes after Young provided that story, Jones drove up in the Town Car and told Agent Reyes that he was not Young's stepfather but had just met him and paid him to drive the Aries back down to Fort Lauderdale because he had just purchased the Town Car in Mississippi. Agent Reyes then told Jones to leave the area for a few minutes while he dealt with Young.

When Agent Reyes confronted Young with the fact that Jones was not his stepfather, Young provided his real name, and Reyes discovered that Young had an outstanding warrant from Broward County and took him into custody. When Jones did not return, Agent Reyes took the key from the ignition of the Aries and left a note on the window advising Jones to call him to reclaim the key, but Jones never called.

When Detective Lawson learned that Agent Reyes ran both the W58 JKP tag and the 69 BAM tag, along with the name Henry Lee Jones during the August 25 traffic stop, he began to suspect that the Town Car involved in the use of Mrs. James's stolen credit card might be Jones's Town Car. Detective Lawson contacted the Bartlett, Tennessee, Police Department and learned that Jones had lived in Bartlett as recently as July 2003, and that his address in Bartlett was within one mile of the James residence, where Mr. and Mrs. James were murdered in August 2003. Once it became clear that Jones was in the vicinity of the James residence within a month of their murders and that he was within the vicinity of the Super 8 in Melbourne within a day of Perez's murder, Detective Lawson met with Detective Massey from the Bartlett Police Department to compare the details of the two crime scenes, which were significantly similar. The detectives tracked the use of Mrs. James's stolen credit card from Bartlett, south down I-55 through Mississippi, across north Florida along I-10, and then south down I-95 into Brevard County where it was used by the driver of the white Town Car. The detectives then interviewed Tevarus Young, who was still being held on his Broward County warrant. Young told the detectives that he was present when Jones murdered the Jameses.

Based on the interview with Young, the Bartlett Police Department obtained search warrants for Jones's Aries and Town Car. Some of the items seized from

the cars were: a loaded 9mm handgun, a hook-bladed knife, a Puerto Rican flag, Nike Air Moto shoes, towels and washcloths, a women's ring, a JCPenney bag, clothing, suitcases, a five-gallon bucket full of cleaning supplies, pillow cases containing clothing, a toolbox, a book bag, miscellaneous papers, and a jar of petroleum jelly. Mrs. James's daughter identified the ring as her mother's, and Carlos Perez's father identified the Puerto Rican flag as the one he had given to Carlos.

Jones was arrested for the James murders on September 18, 2003, and interviewed by detectives. The interview was admitted into evidence and played for the jury at trial. During the interview, the detectives asked Jones about his cars. Jones stated that he bought the Town Car from a dealership in Mississippi during the last week of July 2003 or the first week of August 2003. He claimed that he could not take it off the lot on the day he bought it because there was a problem with the title, so he had to return to Mississippi on a later date to pick it up.

Jones said he took Tevarus Young—who Jones claimed he met at a club in Fort Lauderdale—with him in the Dodge Aries from Fort Lauderdale to Mississippi to pick up the Town Car so that Young could drive the Aries back. When Young was arrested after the traffic stop during the return trip on August 25, 2003, the Aries was left on the side of I-95. Jones said that he drove the Town Car back to Fort Lauderdale after Young's arrest and then took a Greyhound bus from

Fort Lauderdale to Melbourne at 4:00 a.m. on August 26, 2003, to pick up the Aries. He said he took a cab from the bus station in Melbourne to the Aries and immediately drove it back to Fort Lauderdale.

Jones admitted that he knew Carlos Perez from Dependable Temps. He said that he and Perez sometimes snorted cocaine together after work and that Perez had been in both the Town Car and the Aries. Jones admitted that he had cleaned the Town Car since Perez was last in it. Jones also explained that his nickname is "Bam" and that the 69 BAM license plate is a reference to him being a sexual "freak."

Throughout the interview Jones repeatedly wavered regarding the degree of his relationship with Perez. Jones relayed many details about Perez and his life, but after being confronted with the fact that there was a video of a black male in a white Town Car using a stolen credit card in Melbourne and told that a witness saw Perez arrive at a motel in Melbourne in Jones's Dodge Aries the day before his body was discovered, Jones attempted to minimize his relationship with Perez, saying, "Me and Carlos didn't even communicate at all" and that they "never hung out like that."

Jones initially denied having been in Melbourne around the time of Perez's murder, but when the detectives told him that they had evidence that he had been in the motel room where Perez's body was found, Jones said that he and his ex-

girlfriend had been to a couple of motels in Melbourne in the past. When told that his shoeprints were found in the motel room, Jones invoked his right to counsel and questioning ceased. He was not arrested for Perez's murder at that time.

Results of forensic analysis done on evidence gathered from the Super 8 provided further confirmation that Jones was involved in Perez's murder. Pubic hairs found on the carpet were determined to have characteristics that were consistent with Jones's pubic hair, and mitochondrial DNA analysis of one of the hairs revealed that it matched the profile of a known sample of Jones's mitochondrial DNA, which is unique to not more than 0.26 percent of the African-American population, 0.17 percent of the Caucasian population, and 0.39 percent of the Hispanic population. Perez was excluded as the source of the pubic hair.

An FDLE footwear examiner compared the Nike Air Moto shoes found in Jones's car to the footwear impressions left on the floor of the bathroom in room 217. The analyst concluded that all thirty-nine of the footwear impressions submitted to her from the motel room bathroom could have been made by Jones's Nike shoes based on size, shape, and tread design, and one of the impressions was "most likely" made by Jones's shoes based on size, shape, tread design, and unique wear pattern.

In order to prove that Jones was not just with Perez at the Super 8 but that he was the person who actually killed Perez, the State presented evidence that Jones

also murdered the Jameses in a similar manner. The evidence regarding the James murders established that the bodies of the Jameses were found in their home on Bartlett Boulevard in Bartlett, Tennessee, on August 23, 2003. Bartlett Boulevard is the main thoroughfare through Bartlett, and Mr. James was well-known in town for sitting in his driveway and waving at passers-by. Mrs. James was found lying facedown on the floor of the master bedroom. She was nude except for a pair of panties. Mr. James was found in the laundry room. Ligature marks indicated that both Mr. and Mrs. James had been bound and strangled, but the ligatures were removed before the bodies were discovered. Both victims died from multiple incised wounds to their necks. Some of the wounds were superficial and some were fatal. The major wounds to their necks were both inflicted from the left to the right. There was blood in and around the sink as if somebody tried to wash off bloody hands.

According to Tevarus Young, the events surrounding the James murders transpired as follows. Young met Jones after being kicked out of his girlfriend's house in August of 2003. Young was sleeping in a park in Fort Lauderdale one day and when he woke up, Jones was in front of him and offered him $20 for oral sex. After Young performed oral sex on Jones, Jones invited Young to travel to the Daytona area with him to meet up with some girls he knew. Young accepted the invitation and rode with Jones to the Daytona area, where they spent the night

- 11 -

with the girls.  The next morning, Jones was in an argument with one of the girls and in a hurry to leave.  When Young and Jones got back in the car, Jones said that he wanted to visit some relatives and started driving north.  Young slept for most of the ride and when he tried to talk to Jones, Jones would not respond.  Jones and Young eventually arrived at an apartment complex in Tennessee.  Jones parked the car and said to Young, "Get out, we're here."  Young thought that they were going to visit Jones's relatives in the apartment complex, but then Jones started walking down the street.  When Young asked Jones why he parked at the apartment complex, Jones asked Young why he was asking questions, and Young stopped asking questions.

Young followed Jones to a house where Mr. James was sitting out in front. Jones said to Mr. James, "Hey Pops, how you doing?"  Mr. James said that he had just been released from the hospital and asked Young to take his lawnmower into the backyard for him.  Young obliged, but when he came back around to the front of the house, Jones and Mr. James were gone.  There was no answer at the door, so Young let himself in.  As Young entered the house, Jones came around a corner with some rags and a bloody rope in his hand.  Young followed him into a bedroom where he saw Mrs. James, who was clothed at the time.  Jones threw Mrs. James on the floor and said, "Old lady, do you know what time it is?"  Jones then tied up Mrs. James with the rope, asked her where her purse was, and emptied the

contents of the purse onto a chair. Jones then put the rope around Mrs. James's neck, his foot on her back, and strangled her. He took a hook-bladed knife out from his side and used it to cut the side of her neck multiple times.

Jones handed Young a plastic bag and told him to hold it open while Jones put the rags and the rope used on Mrs. James inside. He then told Young to follow him to the laundry room where Mr. James was already dead on the floor in a puddle of blood. Jones added the contents of Mrs. James's purse and the rings he took off her fingers to the bag and they left.

Jones and Young drove to a gas station where Jones bought gas with Mrs. James's credit card. They also stopped at a JCPenney and a Footlocker to buy themselves new clothes and shoes with money from Mrs. James's wallet. Jones threw most of the other contents of the plastic bag out of the window as they drove on the highway, and he threatened to kill Young and cut off his penis if he told anyone about the murders.

Jones and Young changed into their new clothes and then drove to a car dealership where Jones bought the Town Car. Jones told Young to follow him in the Aries. As they drove, Jones continued to buy gas for both cars with Mrs. James's credit card. At one point, they stopped at a rest area where Jones anally raped Young in the backseat of the Town Car. By the time they reached Brevard County, Young mustered up enough courage to speed up and try to get away from

Jones, which resulted in him being pulled over by Agent Reyes and arrested on the unrelated Broward County warrant. At the time of his arrest, Young was wearing two of Mrs. James's rings.

Young claimed that he did not help Jones murder the Jameses in any way and only held the plastic bag open for Jones after the fact. Jones was ultimately convicted of two counts of first-degree murder and received two death sentences in Shelby County, Tennessee, for the James murders.

The State also introduced evidence relating to the 2002 murder of Keith Gross in Fort Lauderdale. The evidence revealed that Jones met Gross while they were in jail together. After they were released, Jones sold some items to Gross, but Gross failed to pay for the items. Jones became so upset about the money Gross owed him that he would often say to his then-girlfriend, Brandy Collins, "That cracker going to make me kill him if he don't give me my money," referring to Gross. Jones also told Collins that if he ever killed someone, he would do it by cutting his or her throat "front and back," because that method would cause the victim to die instantly. He told Collins, "You got to make sure you cut the throat front and back because it only takes a second for them to call 911." Jones also demonstrated to Collins how to cut from the front of the neck to the jugular vein and around to the back.

On Friday, September 6, 2002, Gross spoke with his family on the phone for the last time. That night, Jones appeared at Collins' bedroom window in a bloody shirt and asked her to bring him another shirt. When Collins asked what happened, Jones told her that he got in a fight at Gross's house with a friend of Gross's. Jones told Collins that blood also got on a blanket she had in the car and he had to get rid of it. Jones left and then returned a couple of hours later and put the knife he always carried under her mattress. Jones then went to sleep but he was agitated, sweating, and twitching in his sleep that night.

The following Monday, Gross's body was discovered in his home. He was lying facedown on the floor with his head on a pillow and his legs spread open. It appeared that the body had been positioned. His wrists were bound behind his back with twine and his legs were bound with the cord from a phone charger. A sheet partially covered his upper body and neck. Once the sheet was removed, it was discovered that Gross suffered devastating and savage injuries to his neck. Because there was no forced entry to the home, law enforcement believed that Gross knew his killer.

The day that Gross's body was discovered, Jones skipped work to stay at home and watch the news. When the murder was reported on the news, Jones said, "I told somebody I was going to kill that cracker. That's what he get [sic]." After the news report, Jones and Collins went over to Gross's house because Jones

- 15 -

wanted to take back the things he sold to Gross. The house was locked, and Jones tried, but was unable, to break the locks and get inside.

An autopsy revealed that Gross's death was caused by multiple cutting or incised wounds to the neck, which transected the left and right jugular veins and the right carotid artery and nearly caused decapitation. The wounds were so deep that the cutting instrument made a cut in the vertebral column causing a chip or fracture of the bone. Petechial hemorrhaging in the gales (a thin layer of tissue that separates the scalp from the skull) could have been caused by strangulation. Lacerations of the anus and rectum were most likely caused by penetration with an object or a human penis.

There was diluted blood on the faucet and in the sink, indicating that the perpetrator made some attempt to clean up after the murder. A bloody toeprint left in the house was later matched to Jones. Investigators also found a piece of paper on Gross's dresser with the name "Bam" and a phone number. It was determined through the investigation that "Bam" was Jones. Jones was interviewed by police and admitted that he knew Gross, had stayed at his house a few times, and had sold him a TV, for which Gross still owed him money. He also admitted going to Gross's house after seeing coverage of the murder on the news. At the time of his trial for the Perez murder in 2013, Jones had not been charged with Gross's murder but was still the primary and only suspect.

During the defense case, Jones elicited testimony from Detective Lawson about another collateral crime that Jones committed against K.F., the seventeen-year-old runaway who was Jones's passenger when he was pulled over in Rockledge on August 15, 2003. K.F. told detectives that after being pulled over in Rockledge, he and Jones checked into a Holiday Inn off I-95 in Brevard County, where Jones attacked him. When they arrived back in Fort Lauderdale and Jones's brother saw the injuries to K.F.'s face and head, Jones told his brother that K.F. was beat up at a club by people who thought he was gay. Jones's brother pleaded with Jones to take K.F. to a hospital for treatment. In a photograph that was taken when K.F. was brought to the hospital, the detectives observed that his eyes were bulging and the whites of his eyes were completely red with petechiae, which is common in cases involving strangulation. When K.F. was released from the hospital he was turned over to the state because he asked for help getting away from Jones. According to detectives, K.F. "looked quite a bit like Carlos Perez and Keith Gross."

## B. Penalty Phase

After the jury returned with a verdict finding Jones guilty of the first-degree premeditated murder of Carlos Perez, Jones requested an attorney for the penalty phase, and the trial court appointed the Public Defender's Office. When the penalty phase was scheduled to begin the next morning, Jones informed the court

that he did not want to be represented by a public defender because he believed that the Public Defender's Office helped the State plant evidence against him. The court reminded Jones that it had heard the same complaint from him previously and the court entered a detailed order at that time finding that it was without merit. Jones then indicated that he would continue to represent himself, stating, "I don't have nothing to do with the Public Defender's Office. I don't even want to talk to them." Over Jones's objection, the trial court appointed the Public Defender as court counsel. The court explained to Jones that court counsel would present mitigation "on [his] behalf as a representative of the court."

Assistant Public Defender Tim Caudill, who represented Jones earlier in the proceedings before Jones decided to represent himself at trial, informed the court of the results of the mitigation investigation he had done previously, what else he would do, and what he would present to the jury if he were representing Jones. Caudill said that his mitigation investigation led him to believe that "there are mental health issues with Mr. Jones and/or organic brain dysfunction with him." Caudill previously retained Dr. Jeffrey Danziger, a forensic psychiatrist, to evaluate Jones, but Jones refused to cooperate. Caudill also explained that he planned to find witnesses who could let the jury know about Jones "and how he got to the point where he is." Caudill contacted several of Jones's family members and believed he could find even more people who would be willing to cooperate,

testify, or provide additional information to Dr. Danziger. Caudill believed that Jones was abused and subjected to torture as a child. Caudill learned that Jones was hit in the head with a hammer while serving a previous prison sentence but was unable to obtain verification because the records were destroyed seven years after Jones was released from prison. Caudill stated that he never got to talk to Jones about these issues because Jones refused to communicate with him or even come out of his cell when Caudill went to the jail to see him. Even after hearing about the mitigation investigation Caudill would have pursued and the mitigation he would have presented, Jones still insisted on representing himself, and the trial court granted his request.

During the penalty phase, the State introduced certified copies of Jones's prior violent felony convictions, including: (1) robbery and kidnapping convictions from Broward County; (2) an aggravated battery conviction from Broward County; and (3) the Shelby County, Tennessee, convictions for the first-degree murders of the Jameses. The State also presented further testimony from Dr. Qaiser to establish additional facts to prove the aggravating circumstances that Perez's murder was especially heinous, atrocious, or cruel and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

Dr. Qaiser explained that the repeated tightening and loosening of the ligature on Perez's neck would have made him hungry for air and caused head, body, chest, back, and abdominal pain as Perez used all of his muscles to try to breathe. All of the incised wounds to the neck would have caused pain and bleeding. Seeing the profuse bleeding from the deeper neck wounds would have caused Perez to be nervous, apprehensive, and to have an increased heart rate. The repeated use of the ligature and the multiple incisions indicated that Perez's suffering continued for "quite a while." Once Perez's windpipe was cut, he began to aspirate blood, which would have caused even more pain because his lungs were no longer a place for aeration or oxygenation; this is called "dyspnea, painful breathing." There was a significant amount of blood in both lungs.

Jones presented no evidence and made no argument to the jury at the penalty phase. The jury recommended a sentence of death by a unanimous vote of twelve to zero.

### C. **Spencer Hearing**

At the beginning of the Spencer hearing, Jones again refused the services of appointed counsel and refused to speak with Dr. Danziger, who was retained by court counsel for the purposes of presenting mental health mitigation. Court counsel, Assistant Public Defender Michael Pirolo, presented the court with

mitigation testimony from Dr. Danziger and three of Jones's half-brothers: Floyd Smith, Eddie Jones, and Bobby Staples.

Floyd Smith testified that life was very tough for Jones and his fourteen siblings and half-siblings while they were growing up in Mississippi in the 1960s. Their mother was not present much and neither of their fathers were present. Jones's father was often committed in a mental institution. Their mother abandoned them and ran off to Florida with a man when Jones was five or six years old. She did not return for three or four years and had no contact with her children while she was gone. They did not always have food, electricity, or running water, and had to go to the bathroom outside in a cornfield behind the house. The brother who was in charge when their mother was gone drank often and was abusive. He would tie up Jones and the other siblings with electrical cords and coat hangers and beat them with "whatever he put in his hands." He would often make Jones lay facedown and then would burn him on the backside with cigarettes.

After Jones was sent to prison as a teenager for abducting a car salesman, Smith did not see him again until he was released when he was in his mid-thirties. Smith learned that Jones was hit in the head with a hammer by another inmate while he was in prison. After Jones was released from prison, Smith noticed that he changed and "something was wrong with him." When Jones was living in

Georgia with one of his sisters in 2003, the sister kicked Jones out for beating up his girlfriend.

Eddie Jones testified about many of the same childhood difficulties that Smith mentioned. At one time, he said, six or seven of the siblings were living in a one bedroom house with the younger children sleeping on the floor. They ate only "welfare meat," cheese, and peanut butter. Eddie remembered having electricity and a TV. Eddie confirmed that Jones was abused by an older brother who beat him with belts and cords and burned him with cigarettes. Eddie and his sister were spared the abuse when they were rescued by neighbors because they had lighter skin and were called "crackers," but the neighbors did not bother with Jones because he had darker skin.

Eddie said that Jones reported hearing things in his ear a few times but Eddie did not know if their mother took him to the doctor for it. Eddie and Jones were close before Jones went to prison, but after his release, Eddie thought Jones had developed a "mean streak." Eddie heard that Jones was hit in the head with a hammer while in prison and "almost died or something like that."

Bobby Staples is four years younger than Jones. He testified that everything was "normal" growing up. He did not remember anything like what Smith and Eddie described. Staples did not really remember Jones before he went to prison, but they developed a good relationship after Jones was released.

Dr. Danziger testified that he was retained by the Public Defender's Office to evaluate Jones. Dr. Danziger went to the jail and explained to Jones that he was there by court order to evaluate him for mitigation purposes. Jones answered questions, spoke coherently, and "said that he was fine, did not need to speak with [Dr. Danziger], did not wish to speak with [Dr. Danziger], and said nothing further." Dr. Danziger reviewed police and investigative reports, jail medical records from Florida and Tennessee, and spoke to four of Jones's siblings. He learned that Jones was on an antidepressant while he was in jail in Tennessee, but that he refused to take one when he was in jail in Florida. Jones's siblings advised Dr. Danziger about the poverty and beatings that Jones endured growing up, the head injury he incurred in prison, and that Jones's father had a history of mental illness. Dr. Danziger testified that the fact Jones's father suffered from what sounded like psychotic symptoms of a mental illness would put Jones at a much greater risk than the general population for mental illness. That potential genetic predisposition together with his deprived and abusive upbringing and the possibility of a severe head injury in prison could explain why Jones's brothers were upstanding citizens while Jones was facing a death sentence.

Dr. Danziger did not diagnose Jones with any mental illness. And due to Jones's lack of cooperation, he was unable to offer an opinion as to whether—under sections 921.141(6)(b) and (f), Florida Statutes (2013)—Jones was under the

influence of extreme mental or emotional disturbance at the time of Perez's murder or whether his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Dr. Danziger did state that, based on the testimony of Jones's brothers, he would offer—under section 921.141(6)(h), Florida Statutes (2013), as "other factors in the defendant's background that would mitigate against imposition of the death penalty"—that Jones had a "strong family history of mental illness, possible history of head injury, possible [history] of auditory hallucinations when he [wa]s young," and an upbringing involving abuse and deprivation.

Jones also presented mitigation at the <u>Spencer</u> hearing through his own testimony. Jones testified that his mother's abandonment when he was almost six years old was a shock because she left without telling him anything. The abandonment left him feeling as though he was not wanted by his mother and it impacted his life ever since. He stated that he lost interest in school and everything else after his mother left. Jones did not understand why his brother tortured and beat him and he had nobody to protect him.

Jones testified that he became involved with the justice system around the age of fifteen. In 1982, at the age of nineteen, he received a thirty-year sentence for robbery, kidnapping, and grand theft but was released in 1997 after serving only sixteen years. Jones recounted being hit in the head with a hammer while in

prison, stating that another inmate surprised him from behind and hit him with a "three-pound pen hammer." He immediately lost consciousness and woke in the hospital where he had to stay for a week or two due to the amount blood he lost. Jones stated that between 1997 and 2003 he "caught a few misdemeanors" but largely stayed out of trouble.

As to why he refused to speak with Dr. Danziger or take an antidepressant in the Brevard County Jail, Jones explained that he does not trust mental health practitioners and is concerned about the effects of psychiatric drugs because he has observed many other people suffer negative effects. Before cross-examination, the court offered Jones another chance to undergo a mental health evaluation, but Jones again declined and stated that he wanted to move forward to sentencing.

On cross-examination, Jones admitted that he spent time at his grandmother's house while growing up and that she "catered" to him. He repeatedly denied ever having murdered anyone and accused the prosecutor of lying, fabricating discovery, and planting evidence. When asked about his mental state, Jones stated that he felt "great."

### D. Sentencing

The trial court concluded that three aggravating circumstances were proven beyond a reasonable doubt: (1) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight); (2) Jones was previously convicted of another

capital felony or of a felony involving the use or threat of violence (great weight); and (3) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight).

The trial court found that no statutory mitigating circumstances and ten nonstatutory mitigating circumstances—some of which were duplicative—were established: (1) Jones was the victim of severe deprivation, abuse, and poverty at a very early age (some weight); (2) Jones grew up without a father figure (little weight); (3) Jones was abandoned by his mother (some weight); (4) Jones had no father/son relationship (some weight); (5) Jones had no mother/son relationship (some weight); (6) Jones's father was a patient in a mental health facility on more than one occasion (little weight); (7) Jones was left in the custody and care of an older sibling who physically and emotionally abused him (some weight); (8) Jones experienced racial discrimination as a young child (little weight); (9) Jones suffered a head injury during a previous period of incarceration (little weight); and (10) Jones exhibited good behavior during trial (little weight).

Concluding that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, the trial court followed the jury's recommendation and imposed a sentence of death.

## I. ANALYSIS

Jones raises the following arguments on appeal: (A) the trial court erred in admitting evidence of collateral crimes; (B) the trial court committed fundamental error by failing to sua sponte instruct the jury regarding the limited purpose of collateral crime evidence prior to its admission or offering Jones an opportunity to request such an instruction prior to the admission of the evidence; (C) the trial court erred in failing to appoint special counsel to present mitigation evidence to the jury during the penalty phase; (D) Jones is entitled to resentencing because the prior violent felony aggravating circumstance was premised on convictions that were subsequently vacated; and (E) Jones's death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002). We address these issues in turn below followed by our independent review of the sufficiency of the evidence and the proportionality of Jones's death sentence.

## A. Admission of Collateral Crime Evidence

Before trial the State provided Jones with notice that it intended to offer evidence of collateral crimes at trial. The State asserted that evidence relating to the James murders in Tennessee was relevant to prove identity, common scheme or plan, and modus operandi with respect to the Perez murder and therefore admissible under Williams v. State, 110 So. 2d 654 (Fla. 1959), and section 90.404(2)(a), Florida Statutes (2013). Jones filed an objection to the admissibility of the James murders, and the trial court held a pretrial hearing on the matter after

which it ruled that the evidence would be admissible at trial.  The State subsequently gave Jones notice that it also intended to introduce evidence at trial relating to the murder of Keith Gross.  Jones did not file an objection prior to trial, but he did object after the State referred to the Gross murder in its opening statement, arguing that evidence of the Gross murder would "show prejudice" towards him.  He objected again during trial on the basis that he had not been indicted for Gross's murder.  Jones claims that the trial court erred in admitting evidence of these collateral crimes.

We review a trial court's decision regarding the admission of collateral crime evidence for abuse of discretion.  Kopsho v. State, 84 So. 3d 204, 217 (Fla. 2012) (citing San Martin v. State, 717 So. 2d 462 (Fla. 1998)).  We have stated the general rule that "unless precluded by some specifically recognized exception, all relevant testimony is admissible."  Williams, 110 So. 2d at 660.  "[R]elevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime."  Id. at 659.  This view is commonly referred to in Florida as the Williams rule and is codified in section 90.404(2)(a), Florida Statutes (2013), which provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

When considering the admissibility of collateral crime evidence, "[t]he test of admissibility is relevancy. The test of inadmissibility is a lack of relevancy." Williams, 110 So. 2d at 660. This is so "whether the evidence tends to exculpate or convict, if it is relevant; that is, if it bears a certain relation to the crime charged to the extent that it is relevant to a fact in issue, such evidence is admissible." Id. at 661.

> The only limitations to the rule of relevancy are that the [S]tate should not be permitted to make the evidence of other crimes the feature of the trial or to introduce the evidence solely for the purpose of showing bad character or propensity, in which event it would not be relevant, and such evidence, even if relevant, should not be admitted if its probative value is substantially outweighed by undue prejudice.

Bryan v. State, 533 So. 2d 744, 746 (Fla. 1988).

Professor Ehrhardt has explained the use of collateral crime evidence to prove identity as follows:

> Evidence of other crimes, acts or wrongs is admissible to prove identity. The most common basis of proving the identity of the person who committed the crime in question is from evidence that collateral crimes were committed by the use of a distinctive modus operandi which was the same as that used in the crime in question. Proof that the defendant committed the other crimes provides a basis for an inference that the defendant committed the crime in question. The fact that the defendant is identified as having committed a prior crime does not, by itself, mean the evidence is relevant. The probative value comes from the fact that the collateral crimes were committed with a unique modus operandi which was the same as that used in the crime in question; therefore, it may be inferred that the same person committed both crimes. When that evidence is coupled with an identification of the defendant as the person who committed the prior crime, the evidence is relevant. Evidence that the defendant has

- 29 -

committed prior crimes, without evidence of a similar unique modus operandi, does not raise the same inference. Only when the court can find that modus operandi is so unusual so that it is reasonable to conclude that the same person committed both crimes is the evidence of the prior crime admissible to prove identity.

Charles W. Ehrhardt, Ehrhardt's Florida Evidence § 404.10, at 292-96 (2016 ed.) (footnotes omitted).

"[I]n cases where the purported relevancy of the collateral crime evidence is the identity of the defendant, we have required 'identifiable points of similarity' between the collateral act and charged crime that 'have some special character or [are] so unusual as to point to the defendant.' " Peterson v. State, 2 So. 3d 146, 153 (Fla. 2009) (alterations in original) (quoting McLean v. State, 934 So. 2d 1248, 1255 (Fla. 2006)). However, the fact that the charged and collateral crimes are not exactly the same "does not preclude admission of collateral crime evidence and, indeed, would erect an almost impossible standard of admissibility." Chandler v. State, 702 So. 2d 186, 194 (Fla. 1997) (citing Gore v. State, 599 So. 2d 978, 984 (Fla. 1992) (observing that we "ha[ve] never required the collateral crime to be absolutely identical to the crime charged")). And where "the common points . . . may not be sufficiently unique or unusual when considered individually, they [may] establish a sufficiently unique pattern of criminal activity when all of the common points are considered together." Gore, 599 So. 2d at 984.

In this case, the trial court did not err in admitting evidence of the collateral murders, which was undoubtedly relevant to prove identity. The evidence at trial established that on August 23, 2003, Jones murdered the Jameses in Bartlett, Tennessee. Both Mr. and Mrs. James were bound during their murders, and the ligatures were removed after death. Both had ligature marks on their necks and petechial hemorrhaging in their eyes, which reflected that they were strangled prior to death. Both also suffered superficial incised wounds to their necks before being killed by a fatal incised wound, which was inflicted from left to right on each victim's neck and severed their jugular veins. The wounds were so deep that Mrs. James had cut marks on her vertebrae. She was undressed and posed facedown with her buttocks facing the ceiling. Blood in and around the bathroom sink indicated that the killer cleaned up after the murder.

The State also presented evidence that Jones was the primary and only suspect in the murder of Keith Gross, which occurred less than a year before the James and Perez murders. The evidence connecting Jones to Gross's murder was strong and included: threats Jones made to kill Gross; admissions Jones made that he did kill Gross; statements Jones made indicating that he would kill someone by cutting their throat from the front to the jugular vein and around to the back; and the bloody toeprint left by Jones in Gross's house.

Gross was found positioned facedown on the floor with his head on a pillow and legs spread open. His wrists were bound behind his back and his legs were bound with the cord from a phone charger. The cause of death was multiple incised wounds to the neck, some of which were so deep they cut into his vertebrae and severed his jugular vein. There was evidence of strangulation and petechial hemorrhaging. There were severe lacerations of the anus and rectum, which were most likely caused by penetration by a human penis or some other object.

Carlos Perez was murdered just days after the Jameses. Perez was also strangled, as evidenced by ligature marks and petechial hemorrhaging. He was bound prior to death and the ligatures—at least one of which was likely the phone cord missing from the room—were removed after death. He suffered incised wounds to his neck ranging from superficial to severely deep and fatal. His neck was cut deep enough to reach and cut into the vertebral bone and sever his jugular vein. There were abrasions to his anus and evidence that he was sexually abused and penetrated at or near the time of his death.

Jones placed himself with Perez on August 25 or 26, 2003, by admitting that Perez had been in his Town Car, which could have only occurred on Monday, August 26. This is so because the Town Car was not brought to Florida until Saturday, August 24, and, considering that the car was in Brevard County on August 25, it likely did not arrive in Fort Lauderdale until Sunday, August 25. It

was then in a Fort Lauderdale repair shop until 7:00 p.m. that Sunday night. Further, Jones said that he had only spent time with Perez on occasions when they would leave Dependable Temps together, which was closed on weekends.

The manager of the Super 8 observed Perez arrive at the motel on August 26 in a car matching the description of one of Jones's cars and enter the motel with a black male, which Jones is. A pubic hair found in the motel room with Perez's body contained a mitochondrial DNA profile matching that of Jones, and a shoeprint found in the attached bathroom had a size, shape, tread pattern, and unique wear characteristics that were consistent with shoes found in Jones's car. Taken together, Jones's statements, the eyewitness testimony, and the forensic evidence were sufficient to prove that Jones was in the motel room with Perez at or near the time of his death. The fact that Jones previously committed murders in a uniquely similar manner to that in which Perez was murdered was therefore extremely relevant to prove that Jones was not only with Perez at the motel but that he was the person who killed him.

Although "the common points" between the Perez murder and the collateral murders "may not [have been] sufficiently unique or unusual when considered individually, they do establish a sufficiently unique pattern of criminal activity when all of the common points are considered together." Gore, 599 So. 2d at 984. It is "[t]he cumulative effect of the numerous similarities between the . . . crimes"

that establishes "a unique modus operandi which points to [the defendant] as the perpetrator of the [instant] homicide." Id. In Chandler v. State, 442 So. 2d 171, 173 & n.2 (Fla. 1983), this Court explained:

> The common points shared by Chandler's Texas crime and the crime charged below may not be sufficiently unique or unusual, when considered individually, to establish a common modus operandi. We find, however, no error in the trial court's determination that these points, considered one with another, establish a sufficiently unique pattern of criminal activity to justify admission of evidence of Chandler's collateral crime as relevant to the issue of identity in the crime charged.[N.2]
>
> > [N.2] The significant common features of Chandler's previous crime and those charged here, as found by the trial court below, included:
> >
> > > 1) In each, a victim's hands were bound behind him with an item belonging to the victim—in one case, a necktie, in the other, the victim's dog leash;
> > >
> > > 2) In each, the victims were first forcibly abducted to a relatively remote location;
> > >
> > > 3) The victims of each crime were beaten repeatedly about the head with a blunt instrument;
> > >
> > > 4) The victims in both instances were robbed;
> > >
> > > 5) The defendant utilized, to some extent, both a knife and a blunt instrument. The apparent difference that the Steinbergers were stabbed repeatedly may be explained by the fact that Chandler's previous victim, who was not stabbed, had survived the beating to testify against Chandler.

As in Chandler, the cumulative effect of the common points of similarity established a sufficiently unique pattern of criminal activity to justify admission of the collateral murders to prove Jones's identity as Perez's killer. Additionally, this case involves not only the cumulative effect of numerous similarities in the manner in which the murders were committed but other similarities, including the fact that all of the victims were previously known to Jones and, most significantly, that Jones was proven—by DNA evidence, a bloody toeprint, or eyewitness testimony—to have been present at all three murder scenes.

In addition to considering the identifiable points of similarity between a crime and any collateral crimes admitted, we also consider the "dissimilarities between the collateral crimes and the charged offense when reviewing whether 'a sufficiently unique pattern of criminal activity [justifies] admission.' " Peterson, 2 So. 3d at 153 (alteration in original) (quoting Chandler, 442 So. 2d at 173.). We will uphold a trial court's decision to admit such evidence where the "substantial similarities among the crimes greatly outweigh[] the dissimilarities." See id. at 154-55 (holding that cumulative pattern of three collateral robberies provided sufficient similarities to charged robbery to be admissible on issue of identity and although sexual batteries during collateral robbery and homicide during instant robbery were "material differences," no error occurred because the substantial similarities greatly outweighed the dissimilarities). Jones asserts that the

differences between the James and Perez murders—that the Jameses were from a different age and racial group than Perez, that they were murdered in their home with an accomplice present, and that there was no evidence that they were sexually assaulted—outweigh the purported similarities and preclude admission of the James murders. We disagree. These dissimilarities are outweighed by the numerous similarities in the manner in which the murders were carried out and the fact that Jones was present at both murder scenes.

We also reject Jones's claim that the trial court erred in allowing the collateral crime evidence to become a feature of the trial. Because this specific argument was not preserved for review by a contemporaneous objection, it is reviewed only for fundamental error. <u>Steinhorst v. State</u>, 412 So. 2d 332, 338 (Fla. 1982). We have defined fundamental error as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." <u>Brooks v. State</u>, 762 So. 2d 879, 899 (Fla. 2000) (citation omitted). While Jones primarily complains about the volume of collateral crime evidence admitted, "collateral crime evidence does not become the impermissible feature of the trial simply because it is voluminous." <u>Peterson</u>, 2 So. 3d at 156. And we have declined to find that the collateral crime evidence became an impermissible feature of the trial in cases in which a considerable amount of collateral crime evidence was unavoidable due to the

nature of the crimes. See, e.g., Conde v. State, 860 So. 2d 930, 946-47 (Fla. 2003) (finding no error in admission of three days of testimony concerning collateral murders, which was unavoidable given fact that five collateral murders were involved). Here, the evidence of the collateral murders was not particularly voluminous and the relevant facts of the collateral murders required the State to present a considerable amount of evidence in order to establish the unusual pattern in which they were committed. Jones has failed to demonstrate any error, let alone fundamental error.

We also reject Jones's unpreserved claim that the probative value of the evidence of the collateral murders was substantially outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (2013) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). As previously explained, evidence of the collateral murders was extremely probative to the issue of identity and although such evidence is also inherently very prejudicial, Jones has not established that the prejudice was unfair or that it substantially outweighed the probative value of the evidence.

### B. Failure to Give a Limiting Instruction

Jones asserts that although he did not request a limiting instruction at the time the collateral crime evidence was admitted, the trial court's failure to provide

a limiting instruction sua sponte should be considered fundamental error. Jones concedes that he is unable to find any case law to support this argument, and we find no merit to this claim.

Section 90.404(2)(d)2., Florida Statutes (2013), governs the use of a limiting jury instruction when collateral crime evidence is admitted and provides, in pertinent part, that "[w]hen the evidence is admitted, the court shall, if requested, charge the jury on the limited purpose for which the evidence is received and is to be considered." (Emphasis added.) The plain language of the statute makes clear that a court is only required to give a limiting instruction at the time collateral crime evidence is admitted if an instruction is requested. Because Jones did not make such a request, the trial court did not err in failing to give a limiting instruction sua sponte. See Pope v. State, 679 So. 2d 710, 714 (Fla. 1996) ("In order to be entitled to a limiting instruction, a defendant must request such an instruction. No request was made on Pope's behalf, therefore the trial judge did not commit error.").

Jones also argues that because of his status as a pro se defendant, the trial court should have offered him the opportunity to request a limiting instruction when the evidence was admitted. This argument is likewise without merit. As "[w]e have previously cautioned, . . . a defendant who elects to proceed without counsel is entirely responsible for his own defense." McKenzie v. State, 153 So.

3d 867, 878 (Fla. 2014) (citing Behr v. Bell, 665 So. 2d 1055, 1056-57 (Fla. 1996)). As a neutral arbiter, a trial court is not in a position to offer the opportunity to request a limiting instruction simply because a defendant has elected to represent himself.

### C. Appointment of Special Counsel

Jones claims that the trial court erred by allowing him to waive his right to present mitigation to the jury. Jones suggests that in order to avoid this situation in the future, this Court should require the appointment of a mitigation specialist in all cases in which the death penalty is sought and the defendant is indigent. We conclude that no error occurred and decline to adopt Jones's suggestion.

It is well established that a competent defendant may waive the right to present mitigation during the penalty phase of a capital trial. See, e.g., Russ v. State, 73 So. 3d 178, 188 (Fla. 2011); Ocha v. State, 826 So. 2d 956, 961 (Fla. 2002); Durocher v. State, 604 So. 2d 810, 812 (Fla. 1992); Pettit v. State, 591 So. 2d 618, 620 (Fla. 1992); Hamblen v. State, 527 So. 2d 800, 804 (Fla. 1988). "Whether a defendant is represented by counsel or is proceeding pro se, the defendant has the right to choose what evidence, if any, the defense will present during the penalty phase." Boyd v. State, 910 So. 2d 167, 189-90 (Fla. 2005) (citing Grim v. State, 841 So. 2d 455, 461 (Fla. 2003)). "[A] defendant cannot be forced to present mitigating evidence during the penalty phase of the trial." Grim,

841 So. 2d at 461. Nor is a trial court required to appoint special counsel for purposes of presenting mitigating evidence to a penalty-phase jury if the defendant has knowingly and voluntarily waived the presentation of such evidence. Id.; see also Jackson v. State, 18 So. 3d 1016, 1033 (Fla. 2009) (holding that trial court is not required to independently provide mitigation evidence to jury where defendant waives the presentation of mitigation to jury). Jones validly waived his right to present mitigation evidence to the penalty-phase jury. He has not shown how the trial court erred by allowing him to waive that right since we have made it clear that a defendant cannot be forced to present mitigating evidence.

Jones also makes a conclusory argument that the Presentence Investigation (PSI) prepared in this case does not meet the standard set forth in Muhammad v. State, 782 So. 2d 343 (Fla. 2001).[1] We need not decide whether Jones's PSI comports with Muhammad, because Muhammad requires the preparation of a PSI only where the defendant refuses to challenge the imposition of the death penalty and refuses to present mitigation evidence. Marquardt v. State, 156 So. 3d 464, 491 (Fla.), cert. denied, 136 S. Ct. 213 (2015); Muhammad, 782 So. 2d at 363; see

---

1. In Muhammad, we prospectively required a PSI "in every case where the defendant is not challenging the imposition of the death penalty and refuses to present mitigation evidence." 782 So. 2d at 363. A "meaningful" PSI "should be comprehensive and should include information such as previous mental health problems (including hospitalizations), school records, and relevant family background." Id.

also Fla. R. Crim. P. 3.710(b) (requiring preparation of a comprehensive PSI in capital cases in which defendant chooses not to challenge death penalty and refuses to present mitigation evidence).  Jones did not refuse to challenge the imposition of the death penalty or refuse to present mitigation.  While Jones did not present mitigation to the jury, he did present mitigation to the court through his own testimony at the Spencer hearing.

Further, the purpose of the Muhammad PSI requirement is to alert the trial court to the probability of significant mitigation so that the trial court can exercise its discretion to call witnesses or appoint counsel to present mitigation to the court. Here, the trial court was alerted to the probable existence of significant mitigation by Assistant Public Defender Caudill before the penalty phase began and appointed court counsel for the purpose of presenting mitigation at the Spencer hearing.  The trial court also "recognized its duty to independently examine the record for any evidence of mitigation, whether presented by the defendant or not." Ocha, 826 So. 2d at 962.  The procedures followed by the trial court were sufficient to ensure that mitigation was presented despite Jones's unwillingness to cooperate with court counsel and the appointed mental health expert.  Jones is not entitled to relief on this claim.

**D.  Prior Violent Felony**

Jones alleges that because his convictions for the James murders were vacated by the Tennessee Supreme Court in September 2014, he is entitled to resentencing. However, in 2015, Jones again stood trial in Tennessee for the James murders and was again convicted and sentenced to death for each murder. See State v. Jones, No. 03-06997 (Tenn. Crim. Ct. of Shelby County, May 16, 2015) (judgment). Thus, even if Jones were entitled to a new penalty phase based on the invalidated convictions, the 2015 convictions would again be admissible at a new penalty phase in support of the prior violent felony aggravating circumstance. Thus, we conclude that any error in using the James murders to support the prior violent felony aggravating circumstance was harmless beyond a reasonable doubt.

Furthermore, in addition to the first-degree murder convictions, the prior violent felony aggravator was also based on a prior robbery conviction.[2] In Preston v. State, 564 So. 2d 120 (Fla. 1990)—on which Jones relies to argue that this Court has previously invalidated sentences where the prior violent felony aggravator was premised on convictions that were subsequently vacated—the prior violent felony aggravating circumstance was based on a single felony conviction for which the defendant later obtained postconviction relief. We expressly distinguished the

_____

2. There is no explanation in the sentencing order as to why the prior violent felony aggravator was not also based on Jones's prior convictions for aggravated battery and kidnapping, certified copies of which were also introduced at the penalty phase.

- 42 -

circumstances in <u>Preston</u> from other cases in which at least one valid prior felony conviction remained on the defendant's record even though another had been set aside. See <u>Preston</u>, 564 So. 2d at 123 (citing <u>Duest v. Dugger</u>, 555 So. 2d 849 (Fla. 1990), <u>Bundy v. State</u>, 538 So. 2d 445 (Fla. 1989), and <u>Daugherty v. State</u>, 533 So. 2d 287 (Fla. 1988)). Here, even if the James murders could not have been used to prove this aggravator, it would still remain valid based on the prior robbery conviction.

### E. **Ring and Hurst**

Jones argues that his death sentence should be vacated because the capital sentencing scheme in effect in Florida at the time of his sentencing in 2014 was unconstitutional under <u>Ring</u>. The United States Supreme Court recently agreed that Florida's former capital sentencing scheme violated the Sixth Amendment in light of <u>Ring</u> because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." <u>Hurst v. Florida</u>, 136 S. Ct. 616, 619 (2016). On remand in <u>Hurst</u>, we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the

mitigating circumstances, and unanimously recommend a sentence of death.

Hurst v. State, 202 So. 3d 40 (Fla. 2016). We stated that "all the findings necessary for imposition of a death sentence are 'elements' that must be found by a jury." Id. at 57.

Here, the jurors were instructed that they could only recommend a sentence of death if they determined that "sufficient aggravating circumstances do exist to justify recommending the imposition of the death penalty" and "that the mitigating circumstances do not outweigh the aggravating circumstances." Inherent then in the unanimous death recommendation were unanimous determinations that the aggravating circumstances were sufficient to impose death and that they outweighed the mitigating circumstances.[3] Thus, there was no error under Hurst with regard to the sufficiency of the aggravation, its weight relative to the mitigation, or the death recommendation.

Hurst error did occur with regard to the remaining "element": that the jury "unanimously and expressly find all the aggravating factors that were proven

_____

3. The fact that Jones declined to present mitigation to the jury during the penalty phase has no bearing here. As previously stated, Jones's waiver of that right was valid, and he "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence." Mullens v. State, 197 So. 3d 16, 40 (Fla. 2016), cert. denied, No. 16-677, 2017 WL 69535 (Jan. 9, 2017).

beyond a reasonable doubt." However, "Hurst error is capable of harmless error review." Id. at 68. Where the jury has not been instructed to find an element of the offense, the test for harmless error asks whether it is clear beyond a reasonable doubt that a rational jury would have found the element of the offense. Neder v. United States, 527 U.S. 1, 18 (1999). Jones's jury was instructed on three aggravating circumstances: (1) prior violent felony (based on the first-degree murders of the Jameses and an earlier robbery conviction); (2) HAC; and (3) CCP. Based on the evidence presented at trial through Dr. Qaiser's testimony and the certified copies of Jones's prior violent felony convictions, we are convinced beyond a reasonable doubt that no rational jury would have failed to unanimously find that all three aggravating circumstances were proven beyond a reasonable doubt. We therefore conclude that this is one of the rare cases in which the Hurst error was harmless beyond a reasonable doubt.

### F. Sufficiency of the Evidence and Proportionality

On direct appeal in death penalty cases, this Court reviews the sufficiency of the evidence and the proportionality of the death sentence regardless of whether the defendant presents those issues for review. Fla. R. App. P. 9.142(a)(5).

### 1. Sufficiency of the Evidence

"In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of

fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001). "Our duty on appeal is to review the record in the light most favorable to the prevailing theory and to sustain that theory if it is supported by competent[,] substantial evidence." Orme v. State, 677 So. 2d 258, 262 (Fla. 1996). If the evidence of guilt is wholly circumstantial, "not only must the evidence be sufficient to establish each element of the offense, but the evidence also must be inconsistent with any reasonable hypothesis of innocence proposed by the defendant." Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010). Here, we conclude that a rational trier of fact could have found that the elements of first-degree premeditated murder were proven beyond a reasonable doubt and that the evidence was inconsistent with any reasonable hypothesis of innocence.

"Premeditation is a fully formed conscious purpose to kill that may be formed in a moment and need only exist for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act." Asay v. State, 580 So. 2d 610, 612 (Fla. 1991). Competent, substantial evidence supports the jury's verdict of premeditation. Dr. Qaiser testified that before the fatal wound was inflicted, Perez was bound and strangled with a ligature at least twice and received at least seven other incised wounds to his neck. According to Dr. Qaiser, the whole ordeal went on for "quite a while."

- 46 -

The fact that Perez was strangled by a ligature at least twice is sufficient evidence to sustain the jury's finding of premeditation. See Johnston v. State, 863 So. 2d 271, 285 (Fla. 2003) (finding sufficient evidence to establish premeditation where medical examiner "opined that the strangulation in this case was not a constant, continuous compression, but was 'more of a manual throttling . . . meaning it was more pressure, release, pressure, release' " (alteration in original)). The fact that Perez's neck was cut no less than eight times, with some of the wounds being deep enough and forceful enough to cut the muscles, jugular vein, windpipe, and vertebral bone, was also sufficient on its own to establish premeditation. See Jackson v. State, 180 So. 3d 938, 957 (Fla. 2015) (concluding that nature, number, and manner of victim's wounds provided competent, substantial evidence to support finding of premeditated murder), cert. denied, 136 S. Ct. 2015 (2016); Miller v. State, 42 So. 3d 204, 228 (Fla. 2010) (concluding that location of wounds and force used in stabbing constituted competent, substantial evidence supporting premeditation); Morrison v. State, 818 So. 2d 432, 452 (Fla. 2002) (concluding that two major knife wounds to neck, one deep enough to nick victim's vertebrae, was sufficient to support jury's finding of premeditation). Together, these facts undoubtedly provide competent, substantial evidence to support the jury's finding that Perez's murder was premeditated.

The evidence identifying Jones as Perez's killer was strong but circumstantial. In summary, the evidence showed that Jones was both with Perez and in Melbourne at or very close to the time of the murder. Jones admitted that Perez had been in his Lincoln Town Car, which was purchased in Mississippi on August 22, 2003, but likely did not arrive in Fort Lauderdale until August 25, and was in the repair shop until 7:00 p.m. that Sunday night. And because Jones was only in the company of Perez on occasions when they left Dependable Temps together, which was closed over the weekend, the only time that Perez could have been in Jones's Town Car was Monday, August 26, 2003. Perez then checked into the Super 8 around noon on August 26, 2003, after arriving in a car matching the description of Jones's other car, and was then seen entering the motel with a black male. He was murdered sometime between midday on August 26 and midday on August 27.

A used Greyhound bus ticket found in Jones's car, which Jones admitted he used, revealed that Jones boarded a bus leaving Fort Lauderdale at 4:00 a.m. on August 27 and arriving in Melbourne around 9:00 a.m. The State theorized that Jones convinced Perez to travel to Brevard County with him on August 26 to pick up the Dodge Aries that was left on the side of I-95 when Tevarus Young was pulled over and taken into custody on August 25, 2003, but after killing Perez,

Jones still did not have a way to get his second car back home to Fort Lauderdale, which is why he had to take the bus to Melbourne the morning of August 27.

A pubic hair containing mitochondrial DNA matching Jones's mitochondrial DNA profile and shoeprints that were likely made by Jones's shoes were found in the motel room where Perez's body was discovered. The evidence also established that Jones had a unique method of committing murder in which he would bind the victims, strangle them with ligatures, and cut their necks multiple times before inflicting the fatal wound from front to back on the right side.

Jones presented no hypothesis of innocence—reasonable or otherwise—to explain why his hair and shoeprints were found in the motel room where Perez was murdered over 100 miles away from where Jones lived. Having lied to detectives about when he returned to Melbourne to pick up his Dodge Aries, his whereabouts on August 26, 2003, were unaccounted for.

Whether Jones committed the murder was an issue that was properly submitted to and decided by the jury. We conclude that there is competent, substantial evidence to support the jury's verdict.

### 2. Proportionality

To ensure uniformity of sentencing in death penalty proceedings, this Court considers the totality of circumstances and compares each case with other capital cases. We do not simply compare the number of aggravating and mitigating

circumstances. Taylor v. State, 937 So. 2d 590, 601 (Fla. 2006). "In performing a proportionality review, a reviewing court must never lose sight of the fact that the death penalty has long been reserved for only the most aggravated and least mitigated of first-degree murders." Urbin v. State, 714 So. 2d 411, 416 (Fla. 1998).

Here, three aggravating circumstances were proven beyond a reasonable doubt: prior violent felony, HAC, and CCP, each of which are among the weightiest of the aggravators. Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010) (prior violent felony and HAC); Wade v. State, 41 So. 3d 857, 879 (Fla. 2010) (HAC and CCP). Ten nonstatutory mitigating circumstances were established, five of which were assigned little weight and five of which were assigned some weight. Many of the mitigating circumstances were cumulative and not particularly compelling. The totality of the mitigation can be summarized as follows: Jones grew up in poverty, did not have a mother/son or father/son relationship, his father was in a mental health facility on more than one occasion, he was viciously abused by a sibling, he experienced racial discrimination as a child, he was hit in the head when he was in prison for a prior felony, and he exhibited good behavior at trial.

Jones's death sentence is proportionate when compared with other capital cases. For example, we upheld a death sentence in Martin v. State, 151 So. 3d 1184, 1187, 1190, nn.4-5 (Fla. 2014), in which the same three aggravating

circumstances were proven and assigned great weight, and one statutory and fifteen nonstatutory mitigating circumstances were established and each was assigned no to some weight. Jones's mitigation is comparable or weaker given the fact that no statutory mitigation was found in his case.

We have found the death penalty to be proportionate in other similar cases. In Duest v. State, 855 So. 2d 33, 45, 47 (Fla. 2003), the death sentence was affirmed where the victim was stabbed twelve times, and three aggravating circumstances—prior violent felony, murder committed during a robbery or for pecuniary gain, and HAC—were weighed against twelve nonstatutory mitigating circumstances. Similarly, in Singleton v. State, 783 So. 2d 970, 972-73, 979-80 (Fla. 2001), we found the death sentence to be proportionate where the victim had been stabbed seven times and the two aggravating circumstances of prior violent felony and HAC were weighed against three statutory mitigating circumstances and nine nonstatutory mitigating circumstances.

We have also, on many occasions, upheld death sentences in cases with more compelling mitigation and less aggravation. See, e.g., Abdool v. State, 53 So. 3d 208, 215-16, 228 (Fla. 2010) (holding death sentence proportionate where CCP and HAC were weighed against four statutory mitigating circumstances and forty-eight nonstatutory mitigating circumstances); Pope, 679 So. 2d at 712-13 & n.1, (Fla. 1996) (upholding death penalty as proportionate in stabbing death where

two aggravating circumstances (committed for pecuniary gain and prior violent felony) were weighed against two statutory mitigating circumstances (extreme mental or emotional disturbance and substantially impaired capacity) as well as nonstatutory mitigating circumstances such as intoxication at the time of the offense).

In light of the presence of three of the weightiest aggravating circumstances and the relatively weak mitigation in this case, we conclude that the death sentence is proportionate as compared with other capital cases.

## III. CONCLUSION

Having reviewed Jones's claims as well as the sufficiency of the evidence and the proportionality of Jones's death sentence, we affirm the judgment of conviction and sentence of death.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
CANADY and POLSTON, JJ., concur as to the conviction and concur in result as to the sentence.
QUINCE, J., concurs in part and dissents in part with an opinion.
PARIENTE, J., dissents with an opinion.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., concurring in part and dissenting in part.

I concur with the majority decision to affirm Jones's conviction but I disagree with the majority's conclusions that "there was no error under Hurst with regard to the sufficiency of the aggravation, its weight relative to the mitigation, or the death recommendation," and "that this is one of the rare cases in which the Hurst error was harmless beyond a reasonable doubt." Maj. op. at 44-45. Because I would find that the Hurst error in this case was not harmless beyond a reasonable doubt, I would remand for resentencing consistent with our decision in Hurst v. State, 202 So. 3d 40 (Fla. 2016).

In Hurst, we held that for a defendant to be eligible for the death sentence, a jury must unanimously find the existence of each aggravating factor, that the aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 202 So. 3d at 44. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that Hurst v. Florida errors are subject to harmless error review, see id. at 68, I do not believe that we can ever find Hurst error harmless when there are aggravating circumstances that require a factual determination based on evidence presented to the jury. Because Hurst requires that "requires a jury, not a judge, to find each fact necessary to impose a sentence of death," Hurst v. Florida, 136 U.S.

- 53 -

616, 619 (2016), the error cannot be harmless where such a factual determination was not made.

The three aggravating circumstances in this case were: (1) prior violent felony, (2) HAC, and (3) CCP. The prior violent felony, which was predicated on Jones's conviction for the double murder of Mr. and Mrs. James, is the only aggravator for which we can say, beyond a reasonable doubt, a jury unanimously found applied to this case. The remaining aggravators each required factual findings that, under Hurst, must now be considered and weighed by a jury. As we stated in Hurst, without an interrogatory verdict, we cannot determine which aggravators the jury unanimously found beyond a reasonable doubt. See Hurst, 202 So. 3d at 67.

In Hurst, we declined to speculate why the jurors voted the way they did, yet because here the jury vote was unanimous, the majority is comfortable being "convinced beyond a reasonable doubt that no rational jury would have failed to unanimously find that all three aggravating circumstances were proven beyond a reasonable doubt." Maj. op. at 45. The majority's reweighing of the evidence to support its conclusion is not an appropriate harmless error review. The harmless error review is not a sufficiency of the evidence test, and the majority's analysis should instead focus on the effect of the error in the trier of fact. State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By ignoring the record and concluding that all

aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct the United States Supreme Court cautioned against in Hurst v. Florida. See Hurst v. Florida, 136 S. Ct. at 622 ("The State cannot now treat the advisory recommendation by the jury as the necessary factual finding required by Ring"). Even though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown.

Because the harmless error review is not a sufficiency of the evidence review nor "a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," see DiGuilio, 491 So. 2d at 1138, I conclude that the Hurst error here was harmful.

PARIENTE, J., dissenting.

Jones was convicted of the murder of nineteen-year-old Carlos Perez, a young Hispanic male, who was found in a motel room in Melbourne, Florida, strangled and with his throat slashed. There was also evidence of sexual penetration. At trial, the jury was presented with extensive evidence, including testimony of medical examiners and investigators, and graphic autopsy photographs, pertaining to the unrelated murders of an elderly African-American couple, the Jameses, in their suburban home in Tennessee and one other, even more attenuated crime that occurred at a different time. The evidence of the unrelated collateral crimes, which essentially portrayed Jones as a serial killer,

inevitably became a feature of the trial, requiring Jones to defend against three crimes instead of just one.

Our precedent, however, mandates that unrelated crimes be "strikingly similar" and "unusual" or of "special character" so as to pervade the facts in order to be admissible. Heuring v. State, 513 So. 2d 122, 124 (Fla. 1987); Drake v. State, 400 So. 2d 1217, 1219 (Fla. 1981). In this case, the three crimes—the one being tried and the two collateral crimes—even considered together, do not have the "close similarity of facts, a unique or 'fingerprint' type of information, for the evidence [of the collateral crimes] to be relevant." State v. Savino, 567 So. 2d 892, 894 (Fla. 1990) (citing Drake, 400 So. 2d 1217; State v. Maisto, 427 So. 2d 1120 (Fla. 3d DCA 1983); Sias v. State, 416 So. 2d 1213 (Fla. 3d DCA 1982)).

The majority in this case conflates the superficial similarities between the crimes, such as the manner of death being strangulation and knife wounds to the neck, as sufficient to establish a "fingerprint" of Jones's criminal activities. Although the manner of death in each crime discussed during Jones's trial was similar, it was not "strikingly similar." Heuring, 513 So. 2d at 124. Before admitting the collateral crime evidence, the trial court heard testimony from Tom Davis, a certified profiler. Mr. Davis testified that he found four commonalities

between all three murder scenes:[4] the presence of bindings and/or ligatures, the positioning of the bodies, the victims had their throats slit as well as several superficial knife wounds, and the lack of defensive wounds on the victims' hands, showing that the offender had absolute control over the victims' bodies. However, despite these similarities, nothing about the positioning, ligatures, knife wounds, or lack of defensive wounds is so unique to these, and only these, crimes as to clearly identify Jones as the common perpetrator. None of the factors, individually or comprehensively, are so unique as to point to Jones's "signature" or "fingerprint."

The crimes do not share a single hallmark or unique identifying factor necessary to render these otherwise dissimilar crimes admissible. If the similarities noted by the majority were sufficient to render these collateral crimes admissible, then essentially any similarity to the crime being tried—such as strangulation, gunshot wounds to the head, or struggle, which are common in all murders—could be deemed sufficient to admit collateral crime evidence. In addition, in most cases of death caused by strangulation or stabbing, there is either an absence or presence of defensive wounds, so there is absolutely nothing uncommon about the absence of defensive wounds.

---

4. There were three murder scenes but four murder victims—Perez, Gross, and the Jameses—because the Jameses were murdered at the same scene. See majority op. at 14.

I am concerned not only about the serious due process problem arising from Jones having to defend against three unrelated crimes. I am also concerned that the majority's holding expands the standard for admissibility of collateral crime evidence far beyond this Court's carefully articulated precedent, which aims to "minimize the risk of a wrongful conviction" by setting "a strict standard of relevance" for admitting collateral crimes. McLean v. State, 934 So. 2d 1248, 1255 (Fla. 2006).

All of the crimes presented during Jones's trial lack the unique characteristic or combination of characteristics to set them apart from other offenses such that they point to Jones as the perpetrator. First, the James murders and the Perez murder are not substantially similar. The James murders occurred in a suburban home in Tennessee, whereas the Perez murder occurred in a motel in a high-crime area in Florida. The James murders involved two elderly, African-American victims and was perpetrated by Jones and an accomplice, whereas the Perez murder involved only a young Hispanic male victim and was perpetrated by Jones alone. The Perez murder also involved evidence of sexual assault, while the James murders did not.

Additionally, according to the Sentencing Order, Jones and Perez were co-workers at Dependable Temps, including in the days leading up to the murder. It is unclear why Jones murdered Perez; however, it does not appear that anything was

stolen from Perez. See majority op. at 9. By contrast, as the majority explained, the Jameses appeared to have been murdered, at least in part, as part of a robbery. Jones was later found with the Jameses' belongings, and there is evidence that Jones used Mrs. James's credit card multiple times. Id. at 12-13.

To further illustrate the differences between the Perez and James murders, when analyzing whether the Perez murder should be admitted into evidence during Jones's trial for the James murders, the Tennessee Supreme Court concluded that the evidence was not sufficiently similar to warrant admission and reversed Jones's conviction in the James murders because it found the error of admitting evidence regarding the Perez murder was not harmless:

> In light of our conclusion that the State failed to establish the Perez murder as a signature crime that could be used to prove the Defendant's identity in the James murders, the admission of the evidence regarding the Perez murder was profoundly prejudicial. By allowing the evidence of the Perez murder, a crime for which the Defendant had not been charged, the trial court created an opportunity for the jury to infer that the Defendant committed the uncharged murder and, therefore, must have committed the murders for which he was on trial.

State v. Jones, 450 S.W.3d 866, 899-900 (Tenn. 2014).

There is also no connection between the Perez and Gross murders, which occurred approximately one year apart. Jones knew Gross from when the two had been in jail together. Majority op. at 14. As the majority explained, after Jones and Gross were released from jail, "Jones sold some items to Gross, but Gross

failed to pay for the items." Id.[5] It appears that Jones grew angry about Gross's outstanding debt, and this anger ultimately served as his motive to murder Gross. Id. at 14-16.

The majority relies on this Court's opinion in Chandler v. State, 442 So. 2d 171, 173 & n.2 (Fla. 1983), to support its conclusion that the evidence of the collateral crimes was properly admissible in Jones's trial. See majority op. at 34. The crimes that the Court concluded were permissible collateral criminal evidence in Chandler had five distinct similarities: (1) each victim's hands were bound behind him; (2) the victims were first forcibly abducted in each crime; (3) the victims were each beaten repeatedly about the head with a blunt instrument; (4) the victims were robbed; and (5) the defendant utilized both a knife and a blunt instrument in each of the crimes. 442 So. 2d at 173 & n.2. However, Chandler is distinguishable from the instant case. In this case, there is not a similar motive in each of the crimes, nor was there a modus operandi such as abducting or sexually assaulting each of the victims. Although Jones may have known all of the victims prior to their deaths, as Mr. Davis testified, the victims all had different backgrounds and were all murdered for various reasons, at different times, and in different places.

─────────────

5. According to the Sentencing Order, these "items" were pieces of furniture.

- 60 -

Moreover, in <u>Smith v. State</u>, 866 So. 2d 51 (Fla. 2004), we stated that collateral crime evidence cannot be "the feature of the trial or . . . introduce[d] . . . <u>solely</u> for the purpose of showing bad character or propensity." <u>Id.</u> at 61. However, in Jones's trial, the State discussed the collateral crimes at length because the trial court determined that such explanation was necessary to show how the crimes were connected. In fact, the State was permitted to read into evidence the testimony of Young, Jones's accomplice in the James murders, which explained in-depth the Jameses' deaths. The jury also heard the testimony of Tennessee criminal investigators and the Tennessee medical examiner, and reviewed numerous photographs of the Jameses' bodies and other exhibits.

The State made a similar presentation in relation to the murder of Keith Gross. Gross's father was permitted to testify and identify a photograph of his son. Then the medical examiner on Gross's case testified and presented photographs, reports, and records relating to the autopsy. A Fort Lauderdale investigator also presented photographs of the crime scene in Gross's murder. Allowing the State to present such extensive evidence of the three collateral crimes could have likely led the jury to perceive the defendant as a serial killer.

Finally, regardless of whether the collateral crimes were relevant, even relevant evidence must be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice." § 90.403, Fla. Stat. (2013); <u>accord</u>

majority op. at 37. The majority recognizes this evidentiary principle but then dismisses it, stating that "Jones has not established that the prejudice was unfair or that it substantially outweighed the probative value of the evidence." Majority op. at 37. However, it is inconceivable that the "danger of unfair prejudice" to Jones created by admitting evidence of three previous, atrocious murders did not "substantially outweigh[]" any probative value it provided. § 90.403, Fla. Stat. (2013). Indeed, the majority admits that this evidence was "inherently very prejudicial." Majority op. at 37.

As we explained in McLean, " '[s]imilar fact evidence that the defendant committed a collateral crime is inherently prejudicial' because it 'creates the risk that a conviction will be based on the defendant's bad character or propensity to commit crimes, rather than on proof that he committed the charged offense.' " 934 So. 2d at 1255 (quoting Heuring, 513 So. 2d at 124); see Goodwin v. State, 751 So. 2d 537, 547 (Fla. 1999); Czubak v. State, 570 So. 2d 925, 928 (Fla. 1990). While all evidence presented in a murder trial may be prejudicial, collateral crime evidence heightens this prejudice. Thus, this Court requires that, to be admissible, collateral criminal evidence must "share some unique characteristic or combination of characteristics which sets them apart from other offenses." Heuring, 513 So. 2d at 124.

Accordingly, extraordinary care must be taken before evidence of collateral crimes is admitted. As we explained in Drake:

> The mode of operating theory of proving identity is based on both the similarity of and the unusual nature of the factual situations being compared. <u>A mere general similarity will not render the similar facts legally relevant to show identity. There must be identifiable points of similarity which pervade the compared factual situations.</u> Given sufficient similarity, in order for the similar facts to be relevant the points of similarity must have some special character or be so unusual as to point to the defendant.

400 So. 2d at 1219 (emphasis added.) Therefore, sufficient similarity is a threshold but not determinative of admissibility. Once the threshold of similarity is met, the inquiry is whether the "identifiable points of similarity . . . pervade" the facts and whether the similarity is of "special character" or "so unusual" as to identify the defendant. Id. As demonstrated above, in this case, it is clear that this high threshold was not met and the majority has improperly conflated the commonplace characteristics that the crimes share with the type necessary to establish the unique identifying characteristic of a common perpetrator.

Accordingly, I respectfully dissent.

An Appeal from the Circuit Court in and for Brevard County,
John M. Griesbaum, Judge - Case No. 052009CF031876AXXXXX

James S. Purdy, Public Defender, and George Donald Edward Burden and John M. Selden, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Vivian Ann Singleton, Assistant Attorney General, Daytona Beach, Florida,

for Appellee